# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN DICKERSON, ROBERT HESTER, and NANCY ROBERTS On behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs | ) Case: ) ) CLASS ACTION COMPLAINT |
| vs. | ) ) |
| YORK INTERNATIONAL CORPORATION and JOHNSON CONTROLS INC., | ) JURY TRIAL DEMANDED ) ) |
| Defendants. | |

## COMPLAINT

Plaintiffs on behalf of themselves and the Classes defined herein, alleges as follows:

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of themselves and all persons and/or entities who purchased air conditioners, air handlers and heat pumps (collectively referred to as "HVAC units") manufactured by Defendants Johnson Controls Inc., and/or York International Corporation (collectively referred to as "Johnson Controls"), or who own or have owned a home or other structure in which the HVAC units have been installed, and who suffered damages related to leakage of refrigerant from defective evaporator and/or condenser coil products manufactured by Johnson Controls.

2.     Johnson Controls is in the business of engineering, manufacturing, distributing and marketing heating, ventilation and air conditioning ("HVAC") products for residential and light commercial use.

3.      Johnson Controls designs, manufactures, markets, and distributes HVAC products under the following brand or trade names in the United States: York, Luxaire, Fraser-Johnson and Coleman brands (collectively "Johnson Controls Brands").

4.      The copper evaporator and condenser coils (collectively referred to as "defective coils") used in the HVAC units are defective and insufficient for their designed purpose. Specifically, the defective coils are manufactured from material (i.e., bare copper) that, within the HVAC industry, is well known to be prone to formicary corrosion and other defects which lead to the formation of holes and cracking in the defective coils ("the defect"). These cracks and holes result in leakage of refrigerant under normal usage (a failure that should not occur during the expected lifespan of the HVAC units).  In addition, the defective coils cannot withstand the higher pressure from environmentally friendly refrigerant that is now legally required to be used, further exacerbating the problem.

5.       The defective HVAC units' refrigerant leak is due to a design and manufacturing defect that has existed from the date of their manufacture, and that is prevalent, widespread, and not unique to HVAC units which were purchased by Plaintiffs.  Numerous complaints have been made by aggrieved consumers regarding refrigerant leakage from the defective coils in the HVAC units.

6.      Within the HVAC industry, reasonable design and manufacturing alternatives are and have been available to reduce or prevent the problems caused by defective coils.  The defective coils could have been manufactured from aluminum, a metal that is not susceptible to formicary corrosion. Alternatively, the defective coils could have been coated with polymer sealers or plated with tin to resist corrosion.  These types of measures have virtually eliminated the types of problems like those suffered by Plaintiffs and members of the Classes.

7.     Even though Johnson Controls knew about the defective coils and their susceptibility to corrosion, as well as the availability of feasible alternative designs or materials, upon information and belief, Johnson Controls continued to replace defective copper coils with equally defective copper coils as recently as 2013.

8.   Johnson Controls fails to disclose this known defect to consumers like the Plaintiffs and the members of the Classes.

9.     Additionally, when a refrigerant leak occurs, Johnson Controls fails to compensate consumers for the labor costs to diagnose and repair the HVAC units, or for the costs of replacing the leaked refrigerant.  Plaintiffs' and members of the Classes' damages are direct, proximate, and foreseeable results of the defect and Johnson Controls' misrepresentations and omissions with respect to the same.

10.     Johnson Controls' unfair and unconscionable conduct has caused damages to Plaintiffs and the members of the Classes.  As a result of Johnson Controls' design and manufacture of defective HVAC units, Plaintiffs and members of the Classes are required to pay hundreds or thousands of dollars to diagnose the cause of the problems, then to repair or replace the HVAC coils or units. Likewise, Plaintiffs and members of the Classes incur significant costs to replace refrigerant that has leaked, often several times for the same defective coils.  Finally, Plaintiffs and members of the Classes are forced to pay higher utility bills when their HVAC units do not operate properly due to the defective coils.

## PARTIES

**Plaintiffs**

11.     Plaintiff Steven Dickerson is a resident and citizen of Minbres (Grant County), New Mexico.  On May, 2008, he had a York Split Unit installed in his residence, Johnson

Controls model number AVY36C4KH21A and Serial Number A0H8108590. Johnson Controls manufactured, distributed, and sold this HVAC unit under the York brand name.

12.     Before purchasing his HVAC system, Mr. Dickerson researched various manufacturers. He purchased the Johnson Controls HVAC unit relying upon the warranty that was offered and relying heavily on Johnson Controls' statements about the quality and longevity of its products. At the time that he purchased his HVAC system, he believed that it was the "Cadillac of HVACs."

13.     The total purchase price for Mr. Dickerson's HVAC unit was $5,255.00.  The total amount Mr. Dickerson paid to purchase the York Split Unit and have it installed in his residence was $12,845.00.

14.     On January 27, 2015, Mr. Dickerson engaged Sun Rays Heating & Cooling of Silver City, New Mexico to diagnose problems with the HVAC unit, which was blowing hot air rather than cooling. Sun Rays' technician checked the HVAC unit and noticed it was low on refrigerant. The refrigerant was refilled at an out-of-pocket cost of $138.77.

15.     After the additional refrigerant was added, the HVAC unit operated sufficiently for only about one month, at which time it again ceased to maintain the correct temperature.

16.     In February 2015, Mr. Dickerson's power usage spiked due to his HVAC unit operating improperly and leaking refrigerant.  As the Public Service Company of New Mexico (PNM) chart below shows, Mr. Dickerson's electricity usage charges increased dramatically from less than 1500 kilowatt hours in February 2014 to nearly 2500 kilowatt hours in February 2015.



17.     This time Mr. Dickerson retained J&S Plumbing & Heating of Silver City, New Mexico to diagnose the problem. In early March, J&S's technician discovered a leak in the evaporator (indoor) coil in the HVAC unit. The following is a picture of the original defective copper coil:



18.     On March 11, 2015 presented Mr. Dickerson with a proposal to replace the indoor

coil at an estimated cost of $2,250.00. On March 23, 2015, J&S Plumbing & Heating removed the original copper coil and replaced it with a new Johnson Controls evaporator coil, Model No. S1-37327975004, Serial No. W1G4854471, Order No. 005009310867. Mr. Dickerson's final bill came to $2,126.10. The following is a picture of the new coil:



19.    Mr. Dickerson would not have purchased and installed the Johnson Controls HVAC units had he been informed of the existence of the defective coils, their propensity to prematurely leak refrigerant, and their failure to perform as warranted.  He also would not have purchased and installed the Johnson Controls HVAC unit had he known the HVAC unit's warranty would not cover his out-of-pocket costs to diagnose, repair, and replace refrigerant when HVAC unit failed to perform as described.

20.    Mr. Dickerson notified his Johnson Controls distributor that his York unit had not operated properly, had not performed as it should, and had prematurely failed, but he received no relief from the company and was simply told that his unit was out of warranty.

21.     <u>Plaintiff Robert Hester</u> is a resident and citizen of Lake Charles (Calcasieu Parrish), Louisiana.  On October 30, 2008, Mr. Hester purchased and installed a new Luxaire 13 SEER 2-ton Split System electric air handler and condenser. He purchased this HVAC System from Sims Insulation & Mechanical & Air Conditioning Inc. in Lake Charles, Louisiana for $4,285.00 plus an additional $445.00 for electrical materials and labor. The condensing unit bears model number 310020020061175879 and serial number (Z)TCGD24S21S1A, (S)W0D8777514. The air handling unit is model 311510020066738388 and serial number AHP24B3XH21A, A0F8999691.

22.     Before purchasing the Johnson Control HVAC product, Mr. Hester received and relied upon product literature that was provided to him by Sims. Upon information and belief, this literature was written and distributed by Johnson Controls for its Luxaire products.  The literature stated: "This unit's design has proven reliability and performance. And when we build a product this good, we're happy to stand behind it," "The Climasure family of furnaces, heat pumps and air conditioners is designed to deliver the best efficiency, the quietest operation, and the easiest serviceability," and "Unique MicroChannel coil construction creates superior heat exchange surface that allows a smaller unit to provide higher performance in less space" and "When we build air handlers this good, we stand behind them."

23.     When he purchased his Luxaire system, Mr. Hester relied on Johnson Controls' statements about the quality and longevity of their HVAC units. He looked at the features and options as well as the SEER ratings to determine which system he wanted to purchase.

24.     In September 2014, Mr. Hester noticed that his air conditioning system was not cooling sufficiently. At that time, he contacted Luxaire who informed him that the HVAC unit was not covered by a warranty. On September 15, 2014, Mr. Hester retained Pitcher Air

Conditioning Service of Lake Charles, LA at a cost of $65.00 to diagnose his HVAC system problems. Pitcher Air Conditioning Service discovered that his condenser coil was leaking Freon and verbally estimated that his out-of-pocket cost to repair the system would be $4,300.00. On April 14, 2015, he received a written quote from Rhineaux's A/C and Heat LLC to replace the entire unit with a Heil HVAC system for $4,780.00.

25.     Mr. Hester would not have purchased and installed the Johnson Controls HVAC units had he been informed of the existence of the defective coils and their propensity to prematurely fail, to leak refrigerant and to fail to perform as warranted. He also would not have purchased and installed the Johnson Controls HVAC units had he known the HVAC unit's warranty would not cover costs he incurred to diagnose, repair, and replace refrigerant when HVAC unit failed to perform as described.

26.     Mr. Hester notified Johnson Controls in September 2014 that his Luxaire unit was not operating properly, was not performing as it should, and had prematurely failed. He received no relief from the company.

27.     Plaintiff Nancy Roberts is a resident and citizen of Counce (Hardin County), Tennessee. In 2001, she and her husband built a home in which they installed a York HVAC system. In early 2009, their first York HVAC system's coils were leaking. At that time, they were told by the installer that although York was the "best around," the coil failure was the result of a papermill located approximately 20 miles away rather than a manufacturing defect.

28.     Based upon the installer's and additional York literature, on February 26, 2009, they purchased and installed a second York Packaged HVAC System from Harbin Heating and Air Conditioning, Inc. in Counce, Tennessee. Their unit bears Model Number B2HZ048A06A and Serial Number(s) N0B9580744. Johnson Controls manufactured, distributed, and sold this

HVAC unit under the York brand name. Ms. Roberts registered the HVAC unit within sixty days of its original installation.

29.     Ms. Roberts purchased the Johnson Controls HVAC unit relying upon the warranty that was offered on Johnson Controls HVAC systems, and relying on Johnson Controls' statements about the quality and longevity of its products.

30.     On March 3, 2015 when the HVAC unit was failing to operate correctly, Ms. Roberts had it inspected by a technician from Harbin Heating and Air Conditioning. Harbin Heating and Air informed Ms. Roberts that the HVAC unit's compressor was locked up. Ms. Roberts paid $69.00 for this service call but did not have the system repaired.

31.     A second inspection was performed by another York dealer, Danny Roberts & Sons Heating and Air Conditioning, on September 14, 2014. This technician found that the evaporator coil was leaking, which caused the unit to lock up and cease functioning.  Ms. Roberts paid $230 for this service call. At that time, no Freon was added or repair made on the unit. The technician informed her that it would be a waste of money to add Freon because the unit would just continue to leak and that replacing the unit itself was the best option.  She was quoted a price of $4206 to replace the unit.

32.     The Roberts would not have purchased and installed the Johnson Controls HVAC units had they been informed of the existence of the defective coils and their propensity to prematurely fail, to leak refrigerant, and to fail to perform as warranted.  They also would not have purchased and installed the Johnson Controls HVAC units had they known the HVAC unit's warranty would not cover costs they incurred to diagnose, repair, and replace refrigerant when HVAC unit failed to perform as described.

**Defendants**

33.    York International Corporation designs and manufactures a line of HVAC systems for the industrial, residential, and commercial markets. It offers air conditioners, furnaces, heat pumps, packaged units, mini-split air conditioners and heat pumps, indoor air quality products, air handlers, ventilator systems, thermostats and controls, hybrid systems, humidifiers, air cleaners, dehumidifiers, heating and cooling systems, and cooling only systems for residential customers; and packaged heating and cooling products, packaged heat pumps, indoor and outdoor split systems, chiller products, energy recovery ventilators, and applied equipment for commercial markets.

34.    Originally known as York Corporation, which was founded in 1874, it changed its name to York International Corporation in 1986. York International Corporation is based at 5005 York Dr., Norman, Oklahoma 73069 and maintains a facility at 631 S Richland Ave., York, Pennsylvania 17403. As of December 9, 2005, York International Corporation operates as a subsidiary of Johnson Controls, Inc.

35.    Johnson Controls, Inc., is the parent company of York International Corporation and is located at 5757 N Green Bay Ave., Milwaukee, WI 53209.

36.    Johnson Controls, Inc., describes itself as:

> Johnson Controls is a global diversified technology and industrial leader serving customers in more than 150 countries. Our 170,000 employees create quality products, services and solutions to optimize energy and operational efficiencies of buildings . . .. Our commitment to sustainability dates back to our roots in 1885, with the invention of the first electric room thermostat. Through our growth strategies and by increasing market share we are committed to delivering value to shareholders and making our customers successful.[1]

---

[1] http://www.johnsoncontrols.com/content/us/en/about/our_company.html (last checked April 22, 2015).

10

37.    "Fiscal Year 2014 global sales were $42.8 billion," for Johnson Controls, Inc., which, according to their website, is "No. 68 on U.S. Fortune 500," and "No. 254 on Global Fortune 500."[2]

38.    Johnson Controls Inc., also states it adheres to the following values:

**Integrity**
We act with honesty, fairness, respect and safety, furthering a culture of unquestioned integrity. This strengthens relationships across businesses and functions.

**Customer Satisfaction**
Our future depends on us serving as customer advocates and increasing our customers' success. We are proactive, hard-driving and easy to work with. We offer expert knowledge and practical solutions. We deliver on our promises.[3]

39.    At all times relevant to this Complaint, York International Corporation and Johnson Controls, Inc. transacted business within Pennsylvania and throughout the United States by distributing and selling its products to distributors, installers and retailers for sale to residential consumers.

## JURISDICTION AND VENUE

40.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2).    The matter in controversy in this class action exceeds $5,000,000.00, exclusive of interest and costs, and Plaintiffs and some members of the Class are citizens of states other than the states in which York International Corporation and Johnson Controls, Inc., are incorporated and/or have their primary places of business.

---

[2] http://www.johnsoncontrols.com/content/us/en/about/our_company/company_profile.html (last checked April 22, 2015).

[3] http://www.johnsoncontrols.com/content/us/en/about/our_company/vision_and_values.html (last checked April 22, 2015).

41.     York International Corporation and Johnson Controls, Inc. regularly transact business and maintain a facility in this District and have continuous and systematic contacts with this State by maintaining a facility in York, Pennsylvania and through the sale of HVAC units in Pennsylvania.

42.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because Johnson Controls regularly transacts business in this District and has continuous and systematic contacts with this State by maintaining a facility in York, Pennsylvania and through the sale of HVAC units in Pennsylvania..

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

43.     Plaintiffs bring this action on behalf of themselves and the following Classes under Rule 23 of the Federal Rules of Civil Procedure:

44.     The Rule 23(b)(2) Equitable Relief Class Consists of:

> ***All persons and/or entities who purchased HVAC units manufactured by Johnson Controls or York, or who own a home or other structure in which the HVAC units were installed.***

45.     The Rule 23(b)(3) Classes consist of:

> The National Class (represented by Plaintiffs Dickerson, Hester, and Roberts) consists of:  ***All persons and/or entities who purchased air HVAC units manufactured by Johnson Controls or York, or who own a home or other structure in which the HVAC units were installed, and who suffered damages related to defective design and/or manufacturing of the HVAC units.***

> The Louisiana Class (represented by Plaintiff Robert Hester) consists of:  ***All persons and/or entities in Louisiana who purchased HVAC units manufactured by Johnson Controls or York, or who own a home or other structure in which the HVAC units were installed, and who suffered damages related to defective design and/or manufacturing of the HVAC units.***

The New Mexico Class (represented by Plaintiff Steven Dickerson) consists of: ***All persons and/or entities in New Mexico who purchased HVAC units manufactured by Johnson Controls or York, or who own a home or other structure in which the HVAC units were installed, and who suffered damages related to defective design and/or manufacturing of the HVAC units.***

The Tennessee Class (represented by Plaintiff Nancy Roberts) consists of: ***All persons and/or entities in Tennessee who purchased HVAC units manufactured by Johnson Controls or York, or who own a home or other structure in which the HVAC units were installed, and who suffered damages related to defective design and/or manufacturing of the HVAC units.***

46.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Classes may be expanded or narrowed by amendment or an amended complaint.  Specifically excluded from each of the Classes are York International Corporation, Johnson Controls, Inc., and their officers, directors, agents, trustees, subsidiaries, trusts, representatives, employees, principals, servants, partners, and joint venturers; entities controlled by York International Corporation, Johnson Controls, Inc., and their successors, assigns.

**The Prerequisites of Rule 23(b)(2) are Satisfied.**

47. The prerequisites to maintaining a class action for injunctive, declaratory and equitable relief pursuant to Rule 23(b)(2) exist as Johnson Controls acted or refused to act on grounds generally applicable to the Class thereby making appropriate injunctive, declaratory and equitable relief with respect to the Injunctive Relief Class as a whole.

**The Prerequisites of Rule 23(b)(3) are Satisfied.**

48.     The members of each Class are so numerous that their individual joinder is impracticable.  The precise number of Class members is unknown to the Plaintiffs but is estimated to be in the thousands.  The true number of Class members is known by Johnson

Controls and/or its distributors.  Class members may be notified of the pendency of this action by first class mail, electronic mail and/or by published notice.

49.    The Plaintiffs' and the Class members' claims concern common questions of law and fact that are susceptible to common proof leading to common answers.  Such common questions of law or fact predominate over any questions affecting only individual Class members.  These common legal and/or factual questions include, but are not limited to, the following:

a.    Whether the HVAC units were defectively designed and/or manufactured;

b.    Whether Johnson Controls knew or reasonably should have known about the defects prior to selling HVAC units to Plaintiffs and the Classes;

c.    Whether Johnson Controls failed to disclose the design and/or manufacturing defects;

d.    Whether Johnson Controls breached express warranties relating to the HVAC units to Plaintiffs and the Classes;

e.    Whether Johnson Controls breached implied warranties relating to the HVAC units to Plaintiffs and the Classes;

f.    Whether Johnson Controls was unjustly enriched;

g.    Whether Johnson Controls breached the consumer protection laws of the States of Louisiana, New Mexico, Tennessee, and Florida;

h.    Whether Plaintiffs and the Classes are entitled to declaratory relief;

i.    Whether Plaintiffs and the Classes are entitled to injunctive relief to prevent Johnson Controls and York from continuing their deceptive conduct; and

j.    Whether Plaintiffs and the Classes have sustained monetary losses and, if so, the proper measure of those losses.

50.    Plaintiffs' claims are typical of the claims of the respective Classes they seek to represent in that Plaintiffs and the Classes purchased defective HVAC units and/or were owners

of homes or structures in which defective HVAC units were installed.  Moreover, Plaintiffs, like the Classes, have been damaged by Johnson Controls' misconduct as described herein.

51.     Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained counsel highly experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Classes.

52.     A class action is superior to all available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system with respect to the resolution of the issues set forth in this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court. This action presents no unusual management difficulties.

53.     The claims asserted herein are applicable to Plaintiffs and all consumers, whether individuals or entities, throughout the various States of the Plaintiffs and Class Members who purchased the HVAC units.

54.     Adequate notice can be given to Class members directly using information maintained in Johnson Controls' records, the records of Johnson Controls' distributors, and/or through notice by publication.

## NATURE OF THE CLAIMS

55.     At all relevant times hereto, Johnson Controls was in the business of designing, manufacturing, supplying, marketing, selling and/or distributing HVAC products which were

installed in the Plaintiffs' and Class Members' residences and other structures.  Johnson Controls

knew and intended that its HVAC units would be purchased by residential consumers throughout

the United States.

56.    York states on its website:

Why Buy York® Home Comfort Products? You'll feel right at home with
a new York® home comfort system — because when it's built by York,
it's built right. In everything we do, we strive to bring you the highest
quality service from our products and our people.[4]

A York® air conditioning unit provides the quality and dependability you
need to keep cool, no matter how hot it gets. Our broad lineup of energy
efficient air conditioners makes it easy to satisfy your budget and comfort
level…[5]

LX Series split system air conditioners fit your needs with select
ENERGY STAR® models that reduce your utility bills and MicroChannel
Coil technology that provides more cooling in a smaller footprint.[6]

York® heat pumps provide year-round heating and cooling with quality
you can depend on. Our broad lineup is built to provide heat pump
efficiency for any price point and performance level . . .[7]

For over 135 years, the York® brand has been building a reputation for
quality…Quality Products Built by Quality People…Then our products
undergo performance and reliability testing that is unmatched in our
industry.[8]

The fact that York® products are built right has been recognized by many
prestigious industry awards.  That's because our innovative design and
user friendly features help save energy, ensure sustainability and simplify

---

[4] http://www.york.com/residential/why-buy-york/default.aspx  (last checked April 22, 2015).

[5] http://www.york.com/residential/products/air-conditioners/ (last checked April 22, 2015).

[6] http://www.york.com/residential/products/air-conditioners/  (last checked April 22, 2015).

[7]  http://www.york.com/residential/products/heat-pumps/default.aspx  (last checked April 22, 2015).

[8] http://www.york.com/residential/why-buy-york/default.aspx (last checked April 22, 2015).

maintenance.[9]

It's not just our quality products, it's our quality people that make York a leading brand.[10]

When you purchase a new heating or cooling system, you want it built right so it works right.[11]

Warranties: York® products are built right. That's why they're backed with some of the best limited warranties in the business. Our warranties don't provide minimal coverage. In many cases they lead the industry by covering parts and key mechanical components for longer terms than lesser manufacturers.[12]

57.     Luxaire states on its website:

Luxaire® is a premier line of high performance heating and air conditioning equipment, continually setting the standard in features and innovation. Since 1954, Luxaire has stood for uncompromising quality and unmistakable attention to detail. The latest advancements in quiet technology, energy efficiency and lasting dependability make Luxaire an intelligent choice that delivers optimal comfort and exceptional value.[13]

The annual cost of heating and cooling the average U.S. home is approximately $2,000. Based on recent years, that cost will continue to rise. With an energy-efficient Luxaire® air conditioning or heating system, you don't have to be part of that statistic. If makes financial sense to calculate how much energy a new Luxaire® home comfort system can save you.[14]

Luxaire® is continually setting the standard in features and innovation and is proud to have its products recognized for continued advancements in quality, performance, efficiency and reliability.[15]

---

[9]   http://www.york.com/residential/why-buy-york/award-winning-products.aspx   (last   checked April 22, 2015).

[10] http://www.york.com/residential/why-buy-york/default.aspx (last checked April 22, 2015).

[11]   http://www.york.com/residential/why-buy-york/knowledgeable-service.aspx   (last   checked April 22, 2015).

[12] http://www.york.com/residential/why-buy-york/warranties.aspx (last checked April 22, 2015).

[13] http://www.luxaire.com/ (last checked April 22, 2015).

[14] http://www.luxaire.com/Residential/Energy-Savings (last checked April 22, 2015).

[15] http://www.luxaire.com/Residential/Award-Winning-Products (last checked April 22, 2015).

Every Luxaire® system is built with pride according to strict guidelines to provide years of trouble free operation. That's why our products are backed by some of the best warranties in the business.[16]

Q: How long can I expect a new system to last?

A: If you have a qualified technician perform regular preventive maintenance and service suggested for your unit, industry averages suggest that an air conditioner should last 12-15 years (sea coast applications may be less) and a gas furnace should last as many as 20-25 years.[17]

58.    Johnson Controls states on its website:

At Johnson Controls, we truly understand HVAC systems. In fact, we produce some of the most robust HVAC Equipment, parts and controls on the market today.[18]

59.    These and other statements related to the quality of the HVAC units were made for the purpose of inducing, and were likely to induce, directly or indirectly, purchasers of the defective HVAC units, and they constituted false advertisement in violation of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C § 52. Johnson Controls' statements were accessible to consumers, and particularly to persons who made HVAC purchase decisions on the consumers' behalf or who assisted them in making their HVAC purchasing decisions (e.g., contractors, builders and subcontractors).

60. The life expectancy of a non-defective HVAC unit is generally about fifteen years. When Plaintiffs and the members of the Class purchased their HVAC units or purchased homes or other structures in which the defective HVAC units had been previously installed, they

---

[16] http://www.luxaire.com/Residential/warranties (last checked April 22, 2015).

[17] http://www.luxaire.com/Residential/faq (last checked April 22, 2015).

[18]    http://www.johnsoncontrols.com/content/us/en/products/building_efficiency/products-and-systems/integrated_hvac_systems.html (last checked April 22, 2015).

reasonably expected them to last at least a decade, if not longer, without requiring major repairs.

61.     HVAC systems are composed of three main parts:  a compressor (which facilitates heat transfer), a condenser or condensing unit (the condenser coil moves heat to or from the outside air) and an air handler (containing the evaporator coil that moves heat to or from the inside air).   The compressor and condenser are usually located on outside of the structure and the evaporator is located inside the structure.

62.      Evaporator and condenser coils are both made of metal tubing/piping, usually with metal fins wrapped around it.  The tubing/piping is filled with a refrigerant, which is involved in heat transfer.  The function of the both the evaporator and condenser coils is to condition the air.

63.     The evaporator coil, also called the "indoor coil," is often described as the "cold" coil because it provides cooling by absorbing heat from the indoor air that is blown over the air handler's fan. When hot air flows over the cold, low-pressure evaporator coil, refrigerant inside the evaporator coil absorbs heat from the air and cools it, which changes the refrigerant from a liquid to a gaseous state.

64.     To keep cooling efficiently, an air conditioner then has to convert the refrigerant gas back to a liquid again. To do that, the compressor puts the gas under high pressure, a process that creates unwanted heat. All the extra heat created by compressing the gas to turn it back into a liquid is then evacuated to the outdoors with the help of a second fan. There, the condenser coil, also called the "outdoor coil," which is often described as the "warm" coil, ejects the heat as a fan blows outside air over its surface.



Figure A: Air-conditioning system

65.     A heat pump is simply an air conditioner that is reversible.  A heat pump has a reversing valve that allows the flow of refrigerant to change direction from "heat" to "cooling," and vice versa.  Refrigerant circulates between the outdoor and indoor sections to either produce heat or to cool air.

66.     An HVAC system is a sealed system that should never "use up" or run out of refrigerant, as the refrigerant is simply a medium used to transfer heat from the inside of the building to the outside and is not consumed in the process.  Thus, the only way refrigerant is lost is through a leak in the HVAC system, and a system that is functioning normally should never leak refrigerant.

67.    The Johnson Controls HVAC units were materially defective in that incorporated coils that were defectively designed and/or manufactured from bare copper tubing, a material well-known to be prone to formicary corrosion.  This corrosion and other normal and expected environmental factors create cracks and holes in the tubing, which results in leakage of refrigerant under normal usage, a failure that should not occur during the expected lifespan of the HVAC units. In addition, the defective coils cannot withstand the higher pressure from environmentally friendly refrigerant that is now legally required to be used, further exacerbating the problem.

68.    Formicary corrosion (sometimes referred to as "ant's nest corrosion") is triggered by the presence of four components: water, oxygen, copper and an organic acid. The presence of each of these components produces a pattern of microscopic ant-like tunnels visible on the surface of, and compromising the integrity of, the defective coils.  The defective coils were prone to premature failure and/or corrosion, including general pitting and formicary corrosion, caused by chemicals in the air (e.g., including but not limited to formaldehyde from cleaning products), a defect present at the time of manufacture.

69.    Formicary corrosion is caused by a chemical reaction between molecules known as volatile organic compounds and an HVAC unit's copper tubes that results in microscopic tunnels forming within the tubing.  These tunnels and cracks created from the corrosion are what allow refrigerant to leak.

70.    Volatile organic compounds ("VOCs") are a large group of carbon-based chemicals that derive from a host of common household products and activities. For example, volatile organic compounds are given off by composite wood furniture and flooring; carpeting, cleaning, and disinfecting products; air fresheners; cosmetics; pesticides; and numerous other

consumer products. Household chemicals such as Formaldehyde can be converted to formic acid and then to formate in moisture. Acetic acid is converted to acetate in water.

71.    Modern buildings are typically made more energy efficient by improved sealing of windows and doors, which results in less heated/cooled air escaping the structure.  A natural and foreseeable result of this increase in energy efficiency is that volatile organic compounds accumulate in greater quantities inside modern homes.

72.    According to the Environmental Protection Agency ("EPA"), VOCs which are in the outdoor environment "are volatized or released into the air mostly during manufacture or use of everyday products and materials, while indoors VOCs are mostly released into the air from the use of products and materials containing VOCs. VOCs are of concern as both indoor air pollutants and as outdoor air pollutants."[19]

73.    The defect, especially when subjected to environments with high levels of VOCs, prevents the Johnson Controls HVAC units from operating properly over their entire lifespan.  In addition, the defective coils, when weakened through corrosion and then subject to vibrations or other expected and ordinary conditions, prematurely fail and leak refrigerant.

74.    In addition, the Clean Air Act of 1990, 42 U.S.C. § 7671c, mandated a gradual phase out of the use of R-22 refrigerant in air conditioning and heat pump systems.  In 2009, the EPA banned the sale or distribution of air conditioner appliances containing or requiring R-22 beginning January 1, 2010.  Alternative refrigerants, such as R-410A, which are more environmentally friendly and more energy efficient, are required to be used instead of R-22 in air conditioning units sold in 2010 or after.  However, these alternative refrigerants operate at higher

---

[19] http://www.epa.gov/iaq/voc2.html, last viewed on May 6, 2015.

pressures than R-22.  For example, R-410A operates at up to a 50% higher pressure than R-22.

75.    Johnson Controls' HVAC units were designed with and manufactured using defective coils constructed from materials that were not suitable for their intended purpose, as they corroded and/or cracked when either R-22 refrigerant or higher pressure R-410A refrigerant was used.

76.    Recognizing the problem with formicary corrosion in connection with the use of thin copper tubing, some of Johnson Controls' competitors began producing an all-aluminum air conditioning coil as early as 2005. Nonetheless, despite industry-wide acknowledgement of problems due to formicary corrosion in copper tubing, upon information and belief, Johnson Controls did not begin using aluminum coils until 2013. Even then, the aluminum coils were only incorporated into select air handlers.

77.    As a result of these design and/or manufacturing defects, consumers of Johnson Controls' HVAC units were forced to pay out-of-pocket expenses to diagnose the problem, to pay the labor costs to replace and/or repair the defective parts, to replace the entire HVAC unit in some instances and to replace the lost refrigerant, all of which occurred on multiple occasions for some consumers.

78.    An additional harm caused when refrigerant leaks from a defective HVAC unit is that the evaporator coil can freeze reducing compressor efficiency or even complete failure.  This additional consequence will result in unnecessarily higher utility bills for the consumer.  Johnson Controls fails to disclose that loss of refrigerant causes consumers to experience significantly higher utility bills.  For example, a fifteen percent loss of refrigerant may cost the owner of the system ten percent or more in electrical costs, in addition to causing accelerated wear and tear on

the HVAC units.[20]

79.     Despite its knowledge of the defects and ongoing problems resulting from the defective coils, Johnson Controls failed to disclose that consumers who purchased its defective HVAC units would bear the lion's share of the costs described above.

80.     Upon information and belief, at the time that Johnson Controls sold its HVAC units to the Plaintiffs and members of the Classes, the company knew or should have known that the defective coils leaked and/or failed at an excessively high rate. Upon information and belief, Johnson Controls has discoverable documentation of its defective coil failure rates, testing, including but not limited to technical service bulletins which demonstrate that Johnson Controls was aware of the defective coils prior to the putative class period and prior to the sale of the defective coils to Plaintiffs and members of the Classes.

81.     Because Johnson Controls' HVAC units were sold without disclosing the defect, Plaintiffs and members of the Classes who purchased them, were led to believe their HVAC units were of high quality and would last well over a decade. Instead, they found themselves having to prematurely and repeatedly repair the defective HVAC units when they began to leak refrigerant during normal use.

82.     Upon information and belief, until at least 2013 Johnson Controls replaced defective coils with equally defective replacement coils, ultimately placing Plaintiffs and members of the Classes in a position of having to spend money to replace the defective coils

---

[20] http://inspectapedia.com/aircond/Refrigerant_Undercharge.htm; (last checked April 22, 2015); Kim, Woohyun and Braun, James E., "Impacts of Refrigerant Charge on Air Conditioner and Heat Pump Performance" (2010). International Refrigeration and Air Conditioning Conference. Paper 1122. http://docs.lib.purdue.edu/cgi/viewcontent.cgi?article=2121&context=iracc (last checked April 22, 2015).

more than once in a matter of a few years.

83.     Despite its knowledge of the defective coils, Johnson Controls misrepresented the quality of the HVAC units without disclosing the known problems associated with them.

84.     By failing to disclose that the HVAC units had inherent defects, Johnson Controls engaged in unconscionable, deceptive and/or unfair business practices, causing damages to Plaintiffs and members of the Classes who reasonably expected that the HVAC units would not be defective, and who otherwise would not have purchased their HVAC units had they known the truth.

85.     Johnson Controls' manufacture and distribution of HVAC units without disclosing the foregoing material facts constitutes an unconscionable, deceptive and unfair practice because consumers such as Plaintiffs and members of the Classes who purchased HVAC units expected them to be reliable and to last well over a decade.  Instead, they discovered that their HVAC units failed prematurely due to the defective coils that leaked refrigerant.

86.     Further, Johnson Controls engaged in unconscionable, deceptive and/or unfair practices by failing to notify Plaintiff and the members of the Classes that repairs were necessary for the HVAC units they had purchased due to the defective coils and by then failing to make the necessary repairs at no cost to Plaintiffs and the members of the Classes.  As a result of Johnson Controls' practices, Plaintiffs and members of the Classes had to pay HVAC technicians to diagnose why their HVAC units were not working, had to incur costs to replace, repair and/or maintain their HVAC units, had to pay to replace the leaked refrigerant, and to pay unnecessarily increased energy costs.

87.     Johnson Controls' typical Limited Warranty (attached hereto as Exhibit ___)

provides, in relevant part:[21]

## Limited Warranty

UPG warrants this product to be free from defects in factory workmanship and material under normal use and service and will, at its option, repair or replace any parts that prove to have such defects according to the terms outlined in this warranty.  This warranty covers only the equipment described by the Product Model Number and Serial Number listed on the Warranty Registration Card.

For your benefit and protection, return the Warranty Registration Card to UPG promptly after installation.  This will initiate the warranty period and allow us to contact you should it become necessary.  In the absence of a recorded Warranty Registration Card, the warranty period will begin upon product shipment from UPG.

This warranty extends only to the original consumer purchaser and is non-transferable.  For this warranty to apply, the product must be installed according to UPG recommendations and specifications, and in accordance with all local, state, and national codes; and the product must not be removed from its place of original installation.  The warranty period for repair or replacement parts provided hereunder shall not extend beyond the warranty period stated below.

|  | CONDENSING UNITS[1] | |
|---|---|---|
| **CONDENSING UNITS** | **COMPRESSOR** | **PARTS** |
| 13 SEER | 5 yrs | 5 yrs |
| 14 SEER | 10 yrs | 5 yrs |

1.      All 3 phase condensing units have 5-year compressor and 1-year parts (Model Numbers with 25/46 or T/W voltage codes).

| AIR HANDLERS AND EVAPROATOR COILS |
|---|
| PARTS |
| 5 yrs |

## EXCLUSIONS

This warranty does not cover any:

1.      Shipping, labor, or material charges.
2.      Damages resulting from transportation, installation, or servicing.
3.      Damages resulting from accident, abuse, fire, flood, alteration, or acts of God (tampering, altering, defacing or removing the product serial number will serve to void this warranty).

---

[21] This language comes from the warranty of Plaintiff Hester.  The warranties issued to the other named plaintiffs contain some immaterial differences.

4.  Damages resulting from use of the product in a corrosive atmosphere.
5.  Damages resulting from inadequacy or interruption of electrical service or fuel supply, improper voltage conditions, blown fuses, or other like damages.
6.  Cleaning or replacement of filters.
7.  Damages resulting from failure to properly and regularly clear air and/or water side of condenser and evaporator.
8.  Damages resulting from: (i) freezing of condenser water or condensate; (ii) inadequate or interrupted water supply; (iii) use of corrosive water; (iv) fouling or restriction of the water circuit by foreign material or like causes;
9.  Damages resulting from operation with inadequate supply or air or water.
10. Damages resulting from use of components or accessories not approved by UPG 9vent dampers, etc.).
11. Increase in fuel or electric cost.

88.     Johnson Controls' online statements explicitly denote a performance warranty, which a reasonable consumer would rely upon when purchasing a HVAC unit.

89.     Johnson Controls' Limited Warranty unreasonably disclaims the shipping, labor, or material charges associated with repair of HVAC units.

90.     The provisions of Johnson Controls' warranty are offered without the consumer permitted to bargain as to the terms. Plaintiffs and members of the Classes had no meaningful choice for revision of the warranty at the time of their purchases, and upon information and belief, Plaintiffs were not provided with a copy of the warranty until after the purchase of their HVAC units.  The Johnson Controls warranty is offered on a "take it or leave it" basis to unsuspecting consumers, who did not and could not know of the defective coils at the time of their purchases.

91.     The above-stated limitations on Johnson Controls' warranty are unconscionable. Johnson Controls concealed and failed to disclose to Plaintiffs and members of the Classes that the HVAC units were defectively designed and/or manufactured, would leak, were unsuitable for their intended use, and would require repairs and replacement of parts, at times almost immediately after installation. Johnson Controls was obligated to affirmatively disclose these

concealed facts because: (a) it knew such facts would be unknown and not easily discovered by consumers and would defeat their ordinary, foreseeable, and reasonable expectations concerning the performance of the HVAC units; and (b) it knew its representations regarding the HVAC units would be misleading to consumers in the absence of such disclosures.

92.    In addition, the HVAC units were not merchantable at the time they were sold to Plaintiffs and members of the Classes because they did not satisfy a minimum level of quality. Plaintiffs and members of the Classes purchased their HVAC units under the reasonable belief that they would last for well over a decade, requiring no major repairs during that time. However, the defect caused the HVAC units to fail long before the end of their anticipated useful lives. The defective HVAC units are unfit for the ordinary purpose for which they are used because the loss of refrigerant reduced or eliminated the HVAC units' ability to provide supply air at the selected temperature.

93.    Plaintiffs and members of the Classes are forced to incur significant unanticipated costs to investigate the problem, to replace or repair defective parts and to replace lost refrigerant. In addition, many consumers experience higher utility bills as a result of the HVAC units' failure to operate properly.

94.    Plaintiffs and members of the Classes would not have purchased the defective HVAC units had they known of the defects in the HVAC units.

95.    As a direct and proximate cause of Johnson Controls' misconduct described above, Plaintiffs and members of the Classes have suffered damages.

## THE LEAKAGE PROBLEM WAS PREVALENT

96.    The problems with the defective HVAC units were widespread and have resulted in numerous complaints from angry consumers who spent hundreds or thousands of dollars in

diagnostic testing, repair, replacement, refrigerant replacement, and increased utility costs.

97.     The following are samples of the many complaints posted on websites by frustrated and aggrieved owners of HVAC units about problems with Johnson Controls' HVAC units:

**FROM:** https://www.furnacecompare.com/heat-pumps/york/reviews/

**Name**: Contractor from PA
**Location**: Pennsylvania
**Date created**: 2015-02-26
**Satisfaction Rating**: Very Unsatisfied

**Review**:
**"Absolute junk"**

I am a builder in Pennsylvania, so I know what I'm talking about. I have a 5-year-old York heat pump and it is by far the most problematic item I've ever come across of any kind in any house that I've been in. And believe me, that's a lot. This winter my electric bill has gone from $220 last year to $730-900 monthly this year. All because of faulty defrost boards in the pos. If York was any kind of reputable company, they would reimburse me for this, or at least fix this thing correctly so I can stop hemorrhaging money for electricity. Any quality plumbing fixture company will absolutely pay for any damage that a leaky/defective faucet would do. Anything from buying new countertops to cabinets to replacing floors. I've seen it all. And I am saying York is not a company that you want to do business with.

**Name**: R. Dammers
**Location**: Tampa, FL
**Date created**: 2014-10-10

**Satisfaction Rating**: Very Unsatisfied

Review:"York's inferior coils"

My units were manufactured in 2010. The aluminum alloy used to manufacture the coils is of inferior quality and is susceptible to leakage. The coil is replaced under warranty with a coil that is still of questionable quality, but is now coated. The labor costs for detecting the leakage and replacing the coil is not covered under the regular warranty policy. This results in approximately $750 to $800 in labor costs per unit to have a coil replaced. Speaking to York does not yield any compensation for the labor costs incurred, which would not have been incurred had the unit(s) been fitted with a good quality coil. It appears to be an industry-wide issue. The dealers I have spoken to are all dealing with similar complaints. Buyer beware.

**Name**: Patricia Smalley
**Location**: Henderson, NV
**Satisfaction Rating**: Very Unsatisfied

**Date created**: 2014-08-30

**Review:"Complaint"**

We purchased a 3 1/2 ton York AC unit in March 2013. Yesterday it quit blowing cold air. The company that installed it was on vacation -- they told me to call a tech and then hung up! Had a licensed company come to diagnose the problem! The copper tube was leaking & all Freon except 1 pound was left!! It had to be welded & freon added cost of $872.00 including labor! Is this a factory defect or did installer make errors? Please advise as this was only 1 1/2 yrs old.

**Name**: r mcdowell
**Location**: hurst tx
**Date created**: 2014-04-07
**Satisfaction Rating**: Very Unsatisfied

### Review:"Do not buy York"

Do not buy York..purchased a heat pump in 2011 and condenser coil has failed twice in less than 3 yrs. Cost 734.00 to replace 1st time..trying to work with york to get new unit but they want me to sign a release form relinquishing my warranty rights before they will provide a new unit. I feel this is to be unfair trade practice and should be stopped immediately.

**Name**: Kim
**Location**: Nc
**Date created**: 2013-06-30
**Satisfaction Rating**: Very Unsatisfied

### Review:"York Poor"

Biggest piece of junk ever. I purchased this unit in August 2010. I have had 5 service calls on it, the unit is broke now and not sure when they will fix it. The coil broke in May, now in June the blower is broke and waiting to see when they will fix it. Two times had to wait numerous days for repairs. May 15th repair was completed May 24. I too, will probably be hiring attorney to handle this never ending stressful, expensive, and downright disgusting York Nightmare!

**Name**: B FORD
**Location**: Nebraska
**Date created**: 2013-01-22
**Satisfaction Rating**: Very Unsatisfied

### Review:"Do not buy York"

Replaced outside fan out of pocket before warranty up then 5 months past outside coil failes 2700 repair bill unit is junk

**Name**: r. alder
**Location**: ocean pines, md
**Years owned**: 10
**Date created**: 2012-02-13
**Satisfaction Rating**: Very Unsatisfied

### Review: "Over $4000 in repairs in ten years"

Have gone through 2 coils, circut breaker and compressor. Now it needs another coil at $2000. Not putting any more money in this sinking ship.

**Name**: Kimberly Hathcock
**Location**: Scottsville VA
**Years owned**: 12
**Date created**: 2011-07-26
**Satisfaction Rating**: Very Unsatisfied

**Review:"POOR QUALITY"**

My husband is a contractor and had installed all York units. Our house is 12 years old and the upstairs and downstairs units have been nothing but trouble since year two. Many calls for needing more freon.... Many hot days w/ no ac. We have replaced parts & parts & parts. We replaced the inside unit upstairs 2 years ago. They replaced it with a "comparable" unit that ended up being one that doesn't remove the humidity so it's always very humid in our bedrooms. after paying for another unit, you'd think it would be okay. Two service calls this summer and now it will take $4500 to fix or $4600 to repair - the coil leaks again and again. all of the ones that he has put in houses are the same. One problem after another... Replacements... I believe that there should be a class action suit. We can't afford to buy another unit and knowing too well that the downstairs is acting up too, so that will have to be replaced too in the near future. bad york!

**Name**: J SHANE
**Location**: PA
**Date created**: 2014-07-24

**Satisfaction Rating**: Very Unsatisfied

**Review:"NOT WORTH THE METAL TO BUILD IT"**

Luxaire heat pump 5 years old, replaced the coil the second year, freon leaked out 2 times, warranty just expired and no Freon. cost $400.00 to get Freon added. It does not do a good job of cooling a small home. Runs constantly and can't afford the electric bills for this non efficient junk

**Name**: TomT
**Location**: Tullahoma TN
**Date created**: 2013-10-20
**Satisfaction Rating**: Very Unsatisfied

**Review:"Luxaire Needs to be Sued"**

I bought a package unit from Luxaire and they have turned a durable good into a cheap non-durable good. Their evaporator coil has a manufacturing defect and if we had a court system that was worth its pay, these problems would be fixed through judgements against them on a manufacturing defect (corrosion of evaporator tubing because of cheap production) instead of another corporate scam. Fix the manufacturing defect Johnson Controls, or get out of the business. Pay everyone for the costs your defects have caused and stop scamming the public.

98.     While Johnson Controls was or should have been aware of the defective condition of the HVAC units, the defective condition of the products not discoverable upon reasonable inspection by Plaintiffs and members of the Classes who were not trained technicians.  Leaks

took months or years to fully manifest although the defect existed at the time the HVAC units were manufactured and sold to the Plaintiffs and members of the Classes.

99.     Johnson Controls' refusal to pay for diagnostic, labor and refrigerant replacement costs in order to provide a remedy for the problems caused by the defective HVAC units is unconscionable because it knew of the defect at the time its HVAC units were sold.

100.        Johnson Controls knew or should have known of the existence of the defective coils but failed to disclose the defect to the public, warranted that the products were free from defects, and specifically limited the Plaintiffs' and members of the Classes' ability to seek relief under its warranty.  These acts were misleading and deceptive to the Plaintiffs and members of the Classes since the defect was latent.

101.     Plaintiffs and members of the Classes suffered damages in that they incurred costs because of the defect that were unreasonable and unconscionable because Johnson Controls was aware that the HVAC units were defective and were prone to failure, but failed to disclose these defects.  In addition, Plaintiffs and members of the Classes have conferred a benefit on Johnson Controls by overpaying for their defective HVAC units.  As a result of Johnson Controls' misconduct and omissions, Plaintiffs and members of the Classes failed to receive their benefit they bargain for and suffered losses as a result.


**FIRST CAUSE OF ACTION**
**Declaratory Relief**
**(Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.)**
(Plaintiffs and members of the Equitable Relief Class)

102.     Plaintiffs and members of the Class incorporate by reference and re-allege all paragraphs previously alleged herein.

103.    Johnson Controls designed, manufactured, produced, tested, inspected, marketed, distributed, and sold HVAC units that contain a material design defect as described above.

104.    In the event the fact finder determines that monetary relief is an insufficient remedy for the conduct described above, the Plaintiffs and members of the Class further allege an actual controversy over which this Court has jurisdiction now exists concerning their respective rights, duties and obligations for which Plaintiffs and members of the Class desire a declaration of rights under Johnson Controls' express warranties.  Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

105.    Johnson Controls advertises and warrants its HVAC units' reliability and dependability, in addition to the promises made in its express warranties. Plaintiffs and members of the Class further allege that Johnson Controls breached these warranties when Plaintiffs and members of the Class received HVAC units that were worth less at the time of the purchase than what was promised by Johnson Controls' advertising and express warranties.

106.    Plaintiffs and members of the Class seek a declaration of the parties' respective rights, duties and obligations under the express warranties made by Johnson Controls related to the quality and reliability of its HVAC units, and specifically that Plaintiffs and members of the Class are entitled to recover their out-of-pocket expenses related to repair and/or replacement of their defective HVAC units, or any of their component parts under the express warranties; and, that the HVAC units have defective coils, that Johnson Controls must notify members of the Class about the defect, and that the available express and/or implied warranties provide coverage for repair or replacement of the defective HVAC units.

107.    Plaintiffs further allege that due to Johnson Controls' past practice of replacing

defective coils with equally defective replacement coils, there is a substantial likelihood that the Plaintiffs and members of the Class will suffer additional injury in the future when the defective replacement coils fail.

108.    Absent declaratory relief from the Court, the Plaintiffs' and members of the Class' HVAC units will cease functioning due to their defective coils after the expiration of any applicable warranties, leaving the Plaintiffs and members of the Class with no recourse whatsoever.

109.    A judicial declaration is necessary in order that Plaintiffs and members of the Class may ascertain their rights and duties under the express warranties.  At this time, Plaintiffs and members of the Class have HVAC units that are defective in design, materials and/or workmanship. Plaintiffs and members of the Class suffered damages at the time of their purchases and have paid or will have to pay future repair and/or replacement costs as a direct result of the defect.

## SECOND CAUSE OF ACTION
### Injunctive Relief
(Plaintiffs and members of the Equitable Relief Class)

110.    Plaintiffs and members of the Class incorporate by reference and re-allege all paragraphs previously alleged herein.

111.    Johnson Controls designed, manufactured, produced, tested, inspected, marketed, distributed, and sold HVAC units that contain a material design defect as described above.

112.    Johnson Controls continues to market, distribute, and sell HVAC units manufactured with the defective coils and has done nothing to retrofit or repair these HVAC or remove them from the market and from the possession of consumers. The HVAC units constitute a continuing source of harm and damages to the Plaintiffs and members of the Class.

113.    The defective HVAC units described herein poses an imminent risk of failure to Plaintiffs, members of the Class and the public.

114.    Johnson Controls has never admitted the existence of the defect in the HVAC units, issued any warnings or notices concerning the defect, offered to fully compensate consumers who have incurred expenses as a result of the defect in its HVAC units, nor as it initiated a recall of the defective HVAC units.

115.    Plaintiffs and members of the Class have suffered actual damage or are in immediate risk of suffering damages due to the defective HVAC units.

116.    Plaintiffs and members of the Class request an injunction prohibiting Johnson Controls from continuing to refuse to take appropriate corrective action including but not limited to: a) issuing a nationwide recall to replace and/or retrofit the defectively designed HVAC units; b) issuing warnings and/or notices to consumers concerning the design defects and the risks they pose to the operation of the HVAC units; and, c) if Johnson Controls has not already done so, prohibiting the continuing manufacture, production, marketing, distribution, and sale of the defective HVAC units.

**THIRD CAUSE OF ACTION**
**Breach of Express Warranty**
(Plaintiffs and members of all Classes)

117.    Plaintiffs and members of the Classes incorporate by reference and re-allege all paragraphs previously alleged herein.

118.    Plaintiffs and members of the Classes were required to repair and/or replace one or more defective Johnson Controls HVAC units.

119.    Johnson Controls expressly warranted to Plaintiffs and members of the Classes that each HVAC unit: (a) came with a five year warranty;  (b) "provides the quality and

dependability you need to keep cool, no matter how hot it gets"; and (c) would be free from

defects in materials and workmanship that affect performance under normal use and

maintenance. Johnson Controls' Limited Warranty provides, in relevant part:

### Limited Warranty

> UPG warrants this product to be free from defects in factory workmanship
> and material under normal use and service and will, at its option, repair or
> replace any parts that prove to have such defects according to the terms
> outlined in this warranty.   This warranty covers only the equipment
> described by the Product Model Number and Serial Number listed on the
> Warranty Registration Card.

120.    Johnson Controls made the previously described express affirmations, statements,

assertions, and representations concerning the HVAC units' quality and durability in their

marketing and advertising materials. Such affirmations constitute express warranties.

121.    Plaintiffs and members of the Classes did not have any meaningful choice as to

whether to accept Johnson Controls' warranty limitations at the time they purchased/installed

their HVAC units, and had no ability to negotiate around or waive the provisions of any warranty

limitations.  The warranty terms were presented on a "take-it-or-leave-it" basis.

122.    Johnson Controls breached its warranty because Plaintiffs and members of the

Classes did not receive HVAC units that were free of defects.  Specifically, the HVAC units

were defective, suffering formicary corrosion that resulted in refrigerant leaks.

123.    The defects in the HVAC units are latent and not discoverable on reasonable

inspection.  In addition, replacement of the defective coils with equally defective coils subjects

Plaintiffs and members of the Classes to additional failures, repairs and replacements of the same

parts. As such, Johnson Controls' express warranty fails in its essential purpose.

124.    By notifying their Johnson Controls authorized installers of the failure of their

defective HVAC systems, Plaintiffs and members of the Classes have provided of the defect.

125.    In addition, because the HVAC units contain a latent defect, any warranty limits are unconscionable.

126.    Plaintiffs and members of the Class have suffered actual damage or are in immediate risk of suffering damages due to the defective HVAC units.

**FOURTH CAUSE OF ACTION**
**Breach of Written Warranty**
**(Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq*.)**
(Plaintiffs and members of all Classes)

127.    Plaintiffs and members of the Classes incorporate by reference and re-allege all paragraphs previously alleged herein.

128.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

129.    Plaintiffs and members of the Classes are "consumers" within the meaning of Magnuson-Moss Act, 15 U.S.C. § 2301(3).

130.    Johnson Controls is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. §§ 2301(4)-(5).

131.    The defective HVAC units at issue in this lawsuit are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(1).

132.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

133.    Johnson Controls' express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The defective HVAC units' implied warranties are covered under 15 U.S.C. § 2301(7).

134.    Johnson Controls breached these specific warranties as described in more detail above, and also breached them generally: by manufacturing HVAC units that are defective in design, materials and workmanship and are likely to fail prematurely; by selling defective HVAC units not in merchantable condition, which present an unreasonable risk of failure and are unfit for the ordinary purpose for which HVAC units are used; by providing HVAC units that were defective at the time they were purchased; by refusing to repair or replace free of charge, the defective HVAC units or any of their component parts; by forcing consumers to pay for out-of-pocket costs for diagnostics, labor, repair and replacement parts; and not curing defect once it was known and identified.

135.    Where necessary, Plaintiffs and members of the Classes have had sufficient dealings with Johnson Controls through its written warranties to establish privity of contract.

136.    In addition, privity is not required in this case because Plaintiffs and members of the Classes are intended third-party beneficiaries of Johnson Controls' implied warranties. Installers of the defective HVAC units were not intended to be their ultimate consumers and have no rights under the warranty agreements provided with the HVAC units; rather, the warranty agreements were designed for an intended to benefit only ultimate consumers such as Plaintiffs and members of the Classes.

137.    The amount in controversy of each Plaintiff's individual claim meets or exceeds the sum or value of $25.00.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000.00 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

138.    As a direct and proximate result of Johnson Controls' breach of express warranties, Plaintiffs and members of the Classes sustained damages and other losses in an

amount to be determined at trial.  Johnson Controls' conduct caused Plaintiffs and members of the Classes' losses and accordingly they are entitled to damages, diminution in value, costs, attorney fees, rescission, specific performance, and/or other relief as appropriate.

139.    Johnson Controls is liable to Plaintiffs and members of the Classes pursuant to 15 U.S.C. § 2310(d)(1) because it breached the implied warranty of merchantability.  Specifically, the HVAC units are manufactured with defective coils that render them incapable of performing their intended function for the expected lives.

140.    Johnson Controls also is liable to Plaintiffs and members of the Classes pursuant to 15 U.S.C. § 2310(d)(1) because it breached its express warranties to Plaintiffs and members of the Classes by failing to provide non-defective HVAC units, and/or perform repairs/retrofits sufficient to render the HVAC units non-defective during the warranty period despite knowledge of the defective coils and the risks of failure they posed to Plaintiffs and members of the Classes.

141.    Plaintiffs and members of the Classes gave Johnson Controls an opportunity to cure pursuant to 15 U.S.C. § 2310(e) by *inter alia*, their repeated contacts and complaints about the defect as described herein which notified Johnson Controls of the defect present in its HVAC units, yet it failed to provide Plaintiffs and members of the Classes with non-defective HVAC units.

142.    Further, when notified of a defective HVAC units, Johnson Controls' routinely denies liability for costs of: shipping, labor to diagnose the problem, replacement of the leaked refrigerant, and/or increased utility bills caused by the defect. Plaintiffs have experienced multiple leaks of the same coils, and are concerned that they will be forced to replace the defective coils more than one time due to the nature of this defect.

143.    Even if this was not the case, requiring an informal dispute settlement procedure

and/or to afford Johnson Controls a reasonable opportunity to cure its breach of written warranties to Plaintiffs and members of the Classes would be unnecessary and futile. At the time of sale, Johnson Controls knew, should have known, or was reckless in not knowing of the defect, but nevertheless failed to remedy it and/or disclose it to Plaintiffs and members of the Classes. The remedies available through any informal dispute settlement procedure would be wholly inadequate under the circumstances, and Johnson Controls has not incorporated in its written warranty any requirement that consumers resort to such procedure before pursuing any legal remedy under the Magnuson-Moss Act. Accordingly, any requirement under the Magnuson-Moss Act that Plaintiffs and members of the Classes submit to informal dispute settlement procedures is excused and deemed satisfied, and any requirement to afford Johnson Controls a reasonable opportunity to cure its breach of written or implied warranties to Plaintiffs and members of the Classes has either been satisfied or is excused and deemed satisfied. Plaintiffs have previously notified Johnson Controls that they are acting on behalf of the Classes.

144.    Plaintiffs and members of the Classes would suffer undue economic hardship if they returned their defective HVAC units but did not receive a refund of all payments made by them. Because Johnson Controls refuses to acknowledge any revocation of acceptance and return any payments made, Plaintiffs and members of the Classes have not re-accepted their defective HVAC units by retaining them.

145.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and members of the Classes seek to revoke their acceptance of the defective HVAC units, or, in the alternative seek all damages caused to them by Johnson Controls' breaches of implied and express warranties, which damages constitute the cost of replacing the defective HVAC units with non-defective HVAC units, retrofit of the defective HVAC units, diminution in value of their defective HVAC units plus all

costs Plaintiffs and members of the Classes reasonably incurred or will incur in removing, re-installing, replacing or retrofitting the HVAC units, replacing refrigerant lost due to the defective coils or the labor and other costs associated with these repairs.

146.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and members of the Classes are entitled to recover a sum equal to the aggregate amount of all costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiffs and members of the Classes in connection with the commencement and prosecution of this action.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
(Plaintiffs and members of all Classes)

147.    Plaintiffs and members of the Classes incorporate by reference and re-allege all paragraphs previously alleged herein.

148.    Substantial benefits have been conferred on Johnson Controls by Plaintiffs and members of the Classes by purchasing HVAC units, and Johnson Controls knowingly and willingly accepted and enjoyed those benefits.

149.    Johnson Controls knew or should have known that payments received from Plaintiffs and members of the Classes for HVAC units were paid with the expectation that the HVAC units would perform as represented.

150.    Johnson Controls' retention of these benefits is inequitable.

151.    Plaintiffs and members of the Classes are entitled to recover from Johnson Controls all amounts wrongfully collected and improperly retained by Johnson Controls, plus interest.

152.    As a direct and proximate cause of Johnson Controls' wrongful conduct and unjust enrichment, Plaintiffs and members of the Classes are entitled to an accounting, restitution, attorneys' fees, costs and interest.

**SIXTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(Tenn. Code Ann. § 47-2-313)**
(Plaintiff Nancy Roberts individually and the Tennessee Class)

153.    Ms. Roberts and the Tennessee Class incorporate by reference and re-allege all paragraphs previously alleged herein.

154.    Johnson Controls is a "merchant" within the meaning of Tenn. Code Ann. § 47-2-313.

155.    The HVAC units are "goods" within the meaning of Tenn. Code Ann. § 47-2-313.

156.    Johnson Controls had knowledge of the defects alleged herein by Ms. Roberts and the Tennessee Class.

157.    Despite knowledge of the defects alleged herein, at all times relevant, Johnson Controls expressly warranted in writing that the HVAC units would be free from defects in materials and workmanship under normal use and maintenance for a period of 5 years.

158.    By issuing HVAC units containing the defect to consumers like Ms. Roberts and the Tennessee Class after it gained knowledge of the defect, Johnson Controls breached its express warranty to provide HVAC units that were free from defects.

159.    Johnson Controls also breached its express warranty to provide Products that are free from material defects when it failed to manufacture and sell non-defective coils despite knowledge of the defect and/or despite knowledge of alternative designs and alternative materials.

160.    Upon information and belief, Johnson Controls has not repaired such material defects or component malfunctions in its HVAC units.

161.    Further, any "replacement parts" Johnson Controls offers do not remedy the defects with its HVAC units and are not adequate and cannot be adequate to remedy the issues caused by the defect.

162.    The warranty of repair to the HVAC units fails in its essential purpose because the contractual remedy is insufficient to make Ms. Roberts and the Tennessee Class whole and/or because Johnson Controls has refused to provide the promised remedies within a reasonable time.

163.    Also, as alleged in more detail herein, at the time Johnson Controls warranted and sold the HVAC units, it knew that the HVAC units did not conform to the warranties and were inherently defective, and Johnson Controls wrongfully and fraudulently misrepresented and/or concealed material facts regarding their HVAC units.

164.    Accordingly, Ms. Roberts and the Tennessee Class are not limited to the limited warranty of "replacement parts" and Ms. Roberts and the Tennessee Class seek all remedies allowed by law.

165.    As more fully detailed above, Johnson Controls was notified, through the distributor, of Ms. Roberts' and the Tennessee Class' HVAC unit defect but failed to provide a defect-free HVAC unit to Ms. Roberts and the Tennessee Class free of charge or to provide an adequate retrofit to remedy the defect.

166.    As more fully detailed above, Johnson Controls was provided with notice and has been on notice of the defect and of its breach of express written warranties through thousands of consumer warranty claims reporting problems with the HVAC units, customer complaints,

installer and repairman complaints and its own internal and external testing and failed to repair, replace or retrofit the HVAC units to ensure they were free of materials defects or component malfunctions as Johnson Controls promised.

167.    As a direct and proximate result of Johnson Controls' breach of its express warranties, Ms. Roberts and the Tennessee Class have suffered damages.

**TENTH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**(Tenn. Code Ann. § 47-2-314)**
(Plaintiff Nancy Roberts individually and the Tennessee Class)

168.    Ms. Roberts and the Tennessee Class incorporate by reference and re-allege all paragraphs previously alleged herein.

169.    Johnson Controls is a "merchant" within the meaning of Tenn. Code Ann. § 47-2-314.

170.    The HVAC units are "goods" within the meaning of Tenn. Code Ann. § 47-2-314. Johnson Controls' implied warranty of merchantability accompanied the sale of the HVAC units to Ms. Roberts and the Tennessee Class, and by implication, warranted that the HVAC units were fit for ordinary use.

171.    The design and frequent failure of the HVAC units made them defective and, thus, unfit for the ordinary purposes for which the goods are used. The HVAC units are not fit for ordinary use.

172.    As set forth herein, any effort by Johnson Controls to disclaim or otherwise limit its responsibility for the defective HVAC units is unconscionable because Johnson Controls knew that the HVAC units were unfit for ordinary use and had latent defect(s) in their evaporator and/or condenser coils. Through the conduct described herein, Johnson Controls has breached its

implied warranty of merchantability and is liable to Ms. Roberts and the Tennessee Class.

173.    Ms. Roberts and the Tennessee Class have sustained damages as a result of Johnson Controls' breaches.

174.    Ms. Roberts and the Tennessee Class have provided notice to Johnson Controls through the distributors regarding the problems they experienced with the HVAC units and, notwithstanding such notice, Johnson Controls has failed and refused to remedy the problems. Further, Johnson Controls had actual knowledge of the defect of its Products at the time of the sale to the Plaintiffs and Class Members.

175.    As a result of Johnson Controls' breach of the implied warranty of merchantability, Ms. Roberts and the Tennessee Class have suffered damages.

### SEVENTH CAUSE OF ACTION
#### Breach of Express Warranty
#### (NM Stat § 55-2-313)
(Plaintiff Steven Dickerson individually and the New Mexico Class)

176.    Mr. Dickerson and the New Mexico Class incorporate by reference and re-allege all paragraphs previously alleged herein.

177.    Johnson Controls is a "merchant" within the meaning of NM .Stat § 55-2-104.

178.    The HVAC units are "goods" within the meaning of NM .Stat § 55-2-105.

179.    As fully pled above, Johnson Controls had knowledge of the defects alleged herein by Mr. Dickerson and the New Mexico Class.

180.    Despite knowledge of the defects alleged herein, at all times relevant, Johnson Controls expressly warranted in writing that the HVAC units would be free from defects in materials and workmanship under normal use and maintenance for a period of 5 years.

181.    By issuing HVAC units containing the defect to consumers like Mr. Dickerson

and the New Mexico Class after it gained knowledge of the defect, Johnson Controls breached its express warranty to provide HVAC units that were free from defects.

182.    Johnson Controls also breached its express warranty to provide Products that are free from material defects when it failed to manufacture and sell non-defective coils despite knowledge of the defect and/or despite knowledge of alternative designs and alternative materials.

183.    Upon information and belief, Johnson Controls has not repaired such material defects or component malfunctions in its HVAC units.

184.    Further, any "replacement parts" Johnson Controls offers do not remedy the defects with its HVAC units and are not adequate and cannot be adequate to remedy the issues caused by the defect.

185.    The warranty of repair to the HVAC units fails in its essential purpose because the contractual remedy is insufficient to make Mr. Dickerson and the New Mexico Class whole and/or because Johnson Controls has refused to provide the promised remedies within a reasonable time.

186.    Also, as alleged in more detail herein, at the time Johnson Controls warranted and sold the HVAC units, it knew that the HVAC units did not conform to the warranties and were inherently defective, and Johnson Controls wrongfully and fraudulently misrepresented and/or concealed material facts regarding their HVAC units.

187.    Accordingly, Mr. Dickerson and the New Mexico Class are not limited to the limited warranty of "replacement parts" and Mr. Dickerson and the New Mexico Class seek all remedies allowed by law.

188.    As more fully detailed above, Johnson Controls was notified of Mr. Dickerson's

and the New Mexico Class' defective HVAC unit but failed to provide a defect-free HVAC unit free of charge or to provide an adequate retrofit to remedy the defect.

189.    As more fully detailed above, Johnson Controls was provided with notice and has been on notice of the defect and of its breach of express written warranties through thousands of consumer warranty claims reporting problems with the HVAC units, customer complaints, installer and repairman complaints and its own internal and external testing and failed to repair, replace or retrofit the HVAC units to ensure they were free of materials defects or component malfunctions as Johnson Controls promised.

190.    As a direct and proximate result of Johnson Controls' breach of its express warranties, Mr. Dickerson and the New Mexico Class have suffered damages.

### EIGHT CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability**
**(NM Stat § 55-2-314)**
(Plaintiff Steven Dickerson individually and the New Mexico Class)

191.    Mr. Dickerson and the New Mexico Class incorporate by reference and re-allege all paragraphs previously alleged herein.

192.    Johnson Controls is a "merchant" within the meaning of NM .Stat § 55-2-104.

193.    The HVAC units are "goods" within the meaning of NM .Stat § 55-2-105.

194.    Johnson Controls' implied warranty of merchantability accompanied the sale of the HVAC units to Mr. Dickerson and the New Mexico Class.

195.    Johnson Controls, by implication, warranted that the HVAC units were fit for ordinary use.

196.    The defect manufactured into the HVAC units made them unfit for the ordinary purposes for which HVAC units are used.

47

197.    As set forth herein, any effort by Johnson Controls to disclaim or otherwise limit its responsibility for the defective HVAC units is unconscionable because it knew that the HVAC units were unfit for ordinary use and had a latent defect.

198.    Through the conduct described herein, Johnson Controls has breached its implied warranty of merchantability and is liable to Mr. Dickerson and the New Mexico Class.

199.    Dickerson and the New Mexico Class have sustained damages as a result of Johnson Controls' breaches.

200.    Dickerson and the New Mexico Class have provided notice to Johnson Controls regarding the problems they experienced with the HVAC units and, notwithstanding such notice, Johnson Controls has failed and refused to remedy the problems.  Further, Johnson Controls had actual knowledge of the defect of its Products at the time of the sale to Mr. Dickerson and the New Mexico Class.

201.    As a result of Johnson Controls' breach of the implied warranty of merchantability, Mr. Dickerson and the New Mexico Class have suffered damages.

<u>**NINTH CAUSE OF ACTION**</u>
**Breach of Express Warranty**
**(La.Rev.Stat.Ann. § 9:2800.52)**
(Plaintiff Robert Hester individually and the Louisiana Class)

202.    Mr. Hester and the Louisiana Class incorporate by reference and re-allege all paragraphs previously alleged herein.

203.    Johnson Controls is a "manufacturer" within the meaning of La.Rev.Stat.Ann. § 9:2800.53.

204.    The HVAC units are "Products" within the meaning of La.Rev.Stat.Ann. § 9:2800.53.

205.    As fully pled above, Johnson Controls had knowledge of the defects in manufacturing and design alleged herein by Mr. Hester and the Louisiana Class.

206.    At the time the HVAC units left the control of Johnson Controls, they possessed a characteristic that caused damage and Johnson Controls failed to use reasonable care to provide an adequate warning of such characteristic to purchasers of the HVAC units.

207.    Despite knowledge of the defect alleged herein, at all times relevant, Johnson Controls expressly warranted in writing that the HVAC units would be free from defects in materials and workmanship under normal use and maintenance for a period of five years.

208.    By manufacturing and distributing HVAC units containing the defect to consumers like Mr. Hester and the Louisiana Class after it gained knowledge of the defect, Johnson Controls breached its express warranty to provide HVAC units that were free from defects.

209.    Johnson Controls also breached its express warranty to provide HVAC units that are free from material defects when it failed to manufacture and sell non-defective HVAC units despite knowledge of the defect and/or despite knowledge of reasonable alternative designs and materials.

210.    The warranty of repair to the HVAC units fails in its essential purpose because the contractual remedy is insufficient to make Mr. Hester and the Louisiana Class whole and/or because Johnson Controls has refused to provide the promised remedies within a reasonable time.

211.    Also, as alleged in more detail herein, at the time Johnson Controls warranted and sold the HVAC units, it knew they were inherently defective and did not conform to the warranties. Johnson Controls wrongfully and fraudulently misrepresented and/or concealed these

material facts regarding their HVAC units.

212.   Accordingly, Mr. Hester and the Louisiana Class are not limited to the limited warranty of "replacement parts" and Mr. Hester and the Louisiana Class seek all remedies allowed by law.

213.   As more fully detailed above, Mr. Hester and the Louisiana Class' notified Johnson Controls of the HVAC unit defect, but Johnson Controls failed to provide defect-free HVAC units to Mr. Hester and the Louisiana Class free of charge or to provide an adequate retrofit to remedy the defect.

214.   As more fully detailed above, Johnson Controls was provided with notice and has been on notice of the defect and of its breach of express written warranties through thousands of consumer warranty claims reporting problems with the HVAC units, customer complaints, installer and repairman complaints and its own internal and external testing and failed to repair, replace or retrofit the HVAC units to ensure they were free of materials defects or component malfunctions as Johnson Controls promised.

215.   As a direct and proximate result of Johnson Controls' breach of its express warranties, Mr. Hester and the Louisiana Class have suffered damages.

**TENTH CAUSE OF ACTION**
**Breach of Warranty of Fitness for Ordinary Use**
**(LSA-C.C. Art. 2524)**
(Plaintiff Robert Hester individually and the Louisiana Class)

216.    Mr. Hester and the Louisiana Class incorporate by reference and re-allege all paragraphs previously alleged herein.

217.   Johnson Controls is a "seller" within the meaning of LSA-C.C. Art. 2524 and knew or had reason to know (1) that the HVAC units were not reasonably fit for their ordinary

use, (2) the particular use the buyers of HVAC units intend for the HVAC units, and (3) the buyers of HVAC units relied upon the expertise of Johnson Controls

218.    The design and frequent failure of the HVAC units made them defective and, thus, unfit for the ordinary purposes for which the goods are used. The HVAC units are not fit for ordinary use.

219.    As set forth herein, any effort by Johnson Controls to disclaim or otherwise limit its responsibility for the defective HVAC units is unconscionable because Johnson Controls knew that the HVAC units were unfit for ordinary use and had latent defect(s) in their evaporator and/or condenser coils. Through the conduct described herein, Johnson Controls is liable to Mr. Hester and the Louisiana Class.

220.    Mr. Hester and the Louisiana Class have sustained damages as a result of Johnson Controls' breaches.

221.    Mr. Hester and the Louisiana Class have provided notice to Johnson Controls regarding the problems they experienced with the HVAC units and, notwithstanding such notice, Johnson Controls has failed and/or refused to correct the problems.  Further, Johnson Controls had actual knowledge of the defect at the time of the sale to the Mr. Hester and the Louisiana Class.

222.    As a result of Johnson Controls' actions, Mr. Hester and the Louisiana Class have suffered damages.

## ELEVENTH CAUSE OF ACTION
### Breach of Warranty Against Redhibitory Defects
### ((LSA-C.C. Art. 2520)
(Plaintiff Robert Hester individually and on behalf of the Louisiana Class)

223.    Mr. Hester and the Louisiana Class incorporate by reference and re-allege all

paragraphs previously alleged herein.

224.    Johnson Controls is a "seller" within the meaning of LSA-C.C. Art. 2520.

225.    The design and frequent failure of the HVAC units made them defective and, thus, useless, or their use was so inconvenient that it must be presumed that a buyer would not have bought the HVAC units had he or she known of the defect.

226.    The design and frequent failure of the HVAC units made them defective such that the defect was redhibitory and diminished HVAC units' usefulness or their value, so that it must be presumed that although a consumer may still have purchased an HVAC unit, that consumer would have purchased the HVAC unit for a lesser price.

227.    The warranty against redhibitory vices was not avoided by any express and explicit waiver.

228.    Mr. Hester and the Louisiana Class have provided notice to Johnson Controls regarding the problems they experienced with the HVAC units and, notwithstanding such notice, Johnson Controls has failed and refused to correct the problems.  Further, Johnson Controls had actual knowledge of the defect at the time of the sale to Mr. Hester and the Louisiana Class.

229.    As a result of Johnson Controls' actions, Mr. Hester and the Louisiana Class have suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Members of the respective Classes, pray for judgment against all Defendants as follows:

A.    An Order certifying the Classes and appointing Plaintiffs and their counsel to represent the respective Classes;

B.    An Order declaring the HVAC units to be defective;

C.      An Order declaring that the HVAC units pose an unreasonable risk of failure to consumers and the public;

D.      An Order awarding injunctive relief requiring Johnson Controls to take corrective actions including notification, recall, repair, retrofitting, or to establish a fund in order to make necessary repairs to correct the defects found in the HVAC units as alleged herein; and/or replacement of the defectively designed HVAC units;

E.      An Order awarding Plaintiffs and the Members of the Classes all damages associated with the repair, retrofitting and/or replacement of the defective products and parts, in an amount to be proven at trial;

F.      An Order awarding Plaintiffs and the Members of the Classes all damages associated with property damage as a result of the defective HVAC units, in an amount to be proven at trial;

G.      An Order awarding Plaintiffs and the Members of the Classes all damages associated with loss of value and/or reduced value of the HVAC units and less of the benefit of the bargain as a result of the defect, in an amount to be proven at trial;

H.      An Order awarding restitution as authorized by law;

I.      An Order awarding punitive damages as authorized by law;

J.      An Order awarding specific performance under Johnson Controls' express warranties;

K.      An Order awarding attorneys' fees and costs, as provided by law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Classes;

L.      An Order awarding interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

M.    An Order awarding such other and further relief as this Court may deem just, equitable, or proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: June 5, 2015.                RESPECTFULLY SUBMITTED,

                                    */s Shanon J. Carson*
                                    Shanon J. Carson
                                    Russell D. Paul
                                    BERGER & MONTAGUE, P.C.
                                    1622 Locust Street
                                    Philadelphia, PA 19103
                                    (215) 875-3000 Telephone
                                    (215) 875-4604 Facsimile
                                    scarson@bm.net
                                    rpaul@bm.net

                                    Gregory F. Coleman
                                    Lisa A. White
                                    GREG COLEMAN LAW PC
                                    550 Main Avenue, Suite 600
                                    Knoxville, Tennessee 37902
                                    (865) 247-0080 Telephone
                                    (865) 522-0049 Facsimile
                                    greg@gregcolemanlaw.com
                                    lisa@gregcolemanlaw.com
                                    *by Pro Hac Vice*

                                    Jonathan Shub
                                    KOHN, SWIFT & GRAF, P.C.
                                    One South Broad Street
                                    Suite 2100
                                    Philadelphia, PA 19107
                                    (215) 238-1700 Telephone
                                    (215) 238-1968 Facsimile
                                    *by Pro Hac Vice*
                                    jshub@kohnswift.com

                                    **Attorneys for Plaintiffs and the Classes**