**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEVEN DICKERSON**, *et al.*, | : | **CIVIL ACTION NO. 1:15-CV-1105** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **YORK INTERNATIONAL** | : | |
| **CORPORATION**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

The above-captioned action involves claims arising from the alleged failure of copper evaporator and condenser coils used by defendants York International Corporation and Johnson Controls, Inc., in residential and light-commercial air-conditioning and heat pump systems. Before the court are a motion (Doc. 94) for final approval of class action settlement and motion (Doc. 92) for attorneys' fees and expenses. For the reasons articulated on the record during a fairness hearing convened on August 16, 2017 and reaffirmed in further detail herein, the court will grant both motions.

## I. Factual Background and Procedural History

Plaintiffs commenced this litigation by filing a class action complaint (Doc. 1) on June 5, 2015 against York International Corporation and Johnson Controls, Inc. (collectively "JCI"). The matter is currently proceeding on plaintiffs' first amended complaint (Doc. 31) filed September 21, 2015. Therein, plaintiffs assert claims for declaratory relief, injunctive relief, and unjust enrichment, in addition to claims for breach of express and written warranties under federal and state laws. (Id. ¶¶ 121-

278).  Plaintiffs' claims concern alleged defects in copper evaporator and condenser coils manufactured and sold by JCI and installed in plaintiffs' air-conditioning and heat pump systems.  (See id.)  Plaintiffs allege that the uncoated copper coils used by JCI are known to be vulnerable to formicary corrosion, pitting corrosion, and other defects which result in costly refrigerant leaks under normal usage.  (See id.)  According to plaintiffs, JCI's coils are substandard compared to similar products, *viz.*, tin-coated copper or aluminum coils.  (See id. ¶ 6).  Plaintiffs further contend that, although JCI's limited manufacturer's warranty covers a replacement coil itself, the warranty does not cover labor or refrigerant costs, causing homeowners to incur substantial out-of-pocket expenses.  (See id. ¶¶ 106, 108, 112).

JCI denies these allegations.  (See Doc. 95 at 2, 5).  JCI maintains that only 1.5 percent of all coils manufactured from 2010 to present have failed for any reason, and that less than 10 percent of that number are believed to have failed due to corrosion.  (Id. at 5).  JCI also contends that environmental factors rather than manufacturing defects are likely responsible for the limited occasions of corrosion-induced damage.  (Id.)  JCI moved to dismiss the amended complaint on October 5, 2015.  (Doc. 36).  The motion is fully briefed and raises timeliness, justiciability, and merits challenges to the various counts of plaintiffs' amended complaint.  (See Docs. 39, 48, 51).

The parties moved to stay these proceedings pending mediation on December 22, 2015.  (Doc. 52).  The court granted the motion, and the parties participated in several mediation sessions with retired federal magistrate judge

Diane M. Welsh. Those sessions were successful and ultimately produced the settlement agreement currently before the court for approval. (Doc. 95 at 6-7).

On November 14, 2016, the parties filed a motion (Doc. 78) for preliminary approval of class settlement agreement. The court granted preliminary approval and provisionally certified a settlement class under Federal Rule of Civil Procedure 23 on November 22, 2016. (Doc. 80). The settlement documents compartmentalized the relief to be offered into four distinct categories based on the nature of the harm to class members, as follows:

- Class members who experienced one copper coil failure between January 1, 2008 and the preliminary approval date would receive a $75 service rebate certificate for service performed by an authorized JCI dealer;

- Class members who experienced two or more copper coil failures between January 1, 2008 and the preliminary approval date would receive a check as reimbursement of their out-of-pocket expenses up to $550.00 for each replacement (but no more than $1,100 for all replacements);

- Class members who experience a first copper coil failure after the preliminary approval date would receive an aluminum replacement coil plus a $75 service rebate certificate for service performed by an authorized JCI dealer; and

- Class members who experience two or more copper coil failures, with at least one occurring after the preliminary approval date, would receive an aluminum replacement coil plus a check as reimbursement of their out-of-pocket expenses up to $550.00 for each replacement (but no more than $1,100 for all replacements).

(Doc. 79-1 ¶¶ 15-18).

Counsel contacted the court on December 28, 2016 to request a telephonic status conference concerning the preliminarily-approved settlement. The parties reported recently learning that certain air-conditioning and heat pump systems

could not accept replacement aluminum condenser coils.  (See Doc. 83 ¶ 2).  The
parties initially believed the issue impacted only condenser coil class members, but
eventually learned that a limited number of systems could not accept aluminum
evaporator coils either.  (See id. ¶ 4).  We tasked the parties to develop appropriate
alternative remedies and to file a renewed motion for preliminary approval.  With
the mediator's assistance, the parties negotiated an amended settlement.

The parties filed a motion (Doc. 89) for preliminary approval of the amended
settlement agreement on March 8, 2017.  The categories of relief are unchanged for
class members who experience copper coil failures prior to preliminary approval.
(Doc. 90-1 ¶¶ 15-16).  For copper coil failures post-dating the preliminary approval
date, the parties propose the following relief:

- Class members who experience a first copper coil failure after the
  preliminary approval date will receive:

  o If the failed coil is an evaporator coil, either an aluminum
    replacement coil or a tin-coated copper coil (if aluminum is not
    feasible) in addition to a $75 service rebate certificate for service
    performed by an authorized JCI dealer; or

  o If the failed coil is a condenser coil, a new copper replacement coil
    with an extended copper coil warranty and a $75 service rebate
    certificate for service performed by an authorized JCI dealer.

- Class members who experience two or more copper coil failures after the
  preliminary approval date will receive:

  o If the failed coil is an evaporator coil, either an aluminum
    replacement coil or a tin-coated copper coil (if aluminum is not
    feasible) in addition to a check as reimbursement for out-of-pocket
    expenses up to $550 for each replacement (but no more than $1,100
    for all replacements); or

      o  If the failed coil is a condenser coil, a new copper replacement coil with an extended copper coil warranty in addition to a check as reimbursement for out-of-pocket expenses up to $550 for each replacement (but no more than $1,100 for all replacements).

(Id. ¶¶ 17-18). The settlement allows reimbursement and replacement regardless of the cause of the failure. (See Doc. 95 at 8). The terms of the settlement apply only to copper coil failures that occur while the coil in question is covered by the original manufacturer's warranty. (See Doc. 90-1 ¶¶ 15-18). For those class members whose systems cannot accept a replacement aluminum or tin-coated copper coil, JCI will provide a replacement uncoated copper coil with an extended eight-year parts and labor warranty, in addition to the rebate or reimbursement described above. (See id. ¶¶ 14(O), 17-18). The deadline for filing claims is 120 days after the date of final approval or 120 days after the class member experiences a coil failure, whichever is later. (See id. ¶ 14(F)).

By order dated March 15, 2017, we provisionally certified the settlement class, preliminarily approved the amended settlement agreement, and scheduled a final approval hearing for August 16, 2017. (Doc. 91). The settlement administrator thereafter provided notice to class members in accordance with the court-approved notice plan. (See Doc. 97 ¶¶ 7-12). In addition to internet banner ads, publication notice, and press releases, the settlement administrator disseminated direct notice to 893,620 settlement class members. (See id.) Of those class members, 11,403 returned claim forms.[1] Only twelve objections were received. (See id. ¶ 20).

---

[1] This updated figure was provided to the court by class counsel during the final approval hearing.

The court convened a final approval hearing on August 16, 2017. (Doc. 91). None of the twelve objectors appeared personally or through counsel. During the hearing, the court pressed all counsel about particular aspects of the settlement and fully explored the parties' proposed resolution. We noted on the record that the settlement appears to be fair, reasonable, and adequate. This memorandum supplements and memorializes the court's findings.

## II.   Discussion

### A.     Rule 23 Class Certification

Class certification under Rule 23 requires a two-step process. First, a putative class must meet each of four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 n.6 (3d Cir. 2008). These determinations require a court to conduct a "rigorous analysis" of the relevant evidence to determine whether the elements of Rule 23 have been met. Id. at 310. In considering the evidence, courts should address all relevant legal and factual issues and make preliminary inquiries into the merits of the case. See id. at 317. The party seeking class certification bears the burden to prove, by a preponderance of the evidence, each requirement of Rule 23(a). In re NFL Players Concussion Injury Litig., 821 F.3d 410, 426 (3d Cir. 2016) (quoting In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 391 (3d Cir. 2015)).

Once the elements of Rule 23(a) are satisfied, the suit must fit within one of three categories described in subsection (b). Rule 23(b)(3) certification is proper if a court finds "that the questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The dual requirements of Rule 23(b)(3) are referred to as predominance and superiority. *In re* Hydrogen Peroxide, 552 F.3d at 310.

The parties posit that the elements of Rule 23(a) and 23(b)(3) are easily satisfied. We will address each of the prerequisites *seriatim*. Ultimately, the court agrees that certification of this settlement class is appropriate under Federal Rule of Civil Procedure 23.

### 1. *Numerosity*

No minimum threshold of plaintiffs is required to obtain class certification. See Stewart v. Abraham, 275 F.3d 220, 226 (3d Cir. 2001) (citing 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.22[3][a] (3d ed. 1999)). However, the Third Circuit Court of Appeals has noted that the numerosity requirement is "generally" satisfied if the potential class exceeds 40 members. Id. at 226-27. The settlement administrator herein reports that more than 10,000 class members have submitted claims to date. (See Doc. 97 ¶ 18). Given the nature of the settlement, claims will continue to be filed for the foreseeable future. The numerosity factor resolves in favor of certification.

### 2. *Commonality*

The commonality requirement is satisfied when the named plaintiffs share "at least one" question of law or fact with the prospective class. See Stewart, 275 F.3d at 227 (quoting Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)). Thus, the

requirement "is easily met." <u>Baby Neal</u>, 43 F.3d at 56.  The parties here identify

several common issues of law and fact, including: whether uncoated copper coils

are susceptible to premature failure; whether that failure is due to formicary and

pitting corrosion; whether the alleged corrosion amounts to a "defect"; whether

JCI knew its products were "defective"; whether JCI disclosed the alleged defect

in its products; and whether JCI took measures to mitigate the harm once known.

(<u>See</u> Doc. 95 at 16-17).  These manifold common issues support certification.

### 3.    *Typicality*

The typicality inquiry examines whether the named plaintiffs' interests align

with the interests of absent class members.  <u>See</u> <u>Stewart</u>, 275 F.3d at 227 (quoting

Moore, *supra*, at § 23.24[1]).  Typicality is generally satisfied when each plaintiff

would need to prove the existence of the same adverse behavior by the defendant.

<u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 183-85 (3d Cir.

2001) (citations omitted).  The named plaintiffs' claims and the prospective class

members' claims *sub judice* all arise from allegations that JCI's uncoated copper

coils are defective.  (<u>See</u> Doc. 31 ¶¶ 122-278).  And all claims are grounded in the

same or similar legal theories—principally, breach of implied and express

warranties.  (<u>See</u> <u>id.</u>)  This factor favors certification.

### 4.    *Adequacy*

Under Rule 23(a)(4), class representatives must "fairly and adequately

protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Third Circuit has

explained that the "linchpin of the adequacy requirement is the alignment of

interests and incentives between the representative plaintiffs and the rest of the

class." Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 183-84 (3d Cir. 2012).

The adequacy inquiry comprises two prongs: whether class counsel is competent

and qualified to conduct a class action, and whether the class representatives have

any interests adverse to or conflicting with the prospective class. See id. at 182-83

(citing In re Cmty. Bank, 418 F.3d at 303); In re Chocolate Confectionary Antitrust

Litig., 289 F.R.D. 200, 218 (M.D. Pa. 2012) (Conner, J.) (citing New Directions

Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007)).

As for the first inquiry, plaintiffs maintain that class counsel invested time

and resources in preliminary discovery and substantial research, as well as intense

and protracted settlement negotiations, and that class counsel have considerable

experience in litigating similar class actions. (See Doc. 95 at 19). The court has no

reason to doubt this assertion, which is evidenced by counsel's exemplary, zealous,

and thorough representation at all stages of the settlement process. As for the

second inquiry, all class members, including the named plaintiffs, receive equal

treatment and benefits under the settlement. (See Doc. 90-1 ¶¶ 15-18). These

considerations weigh in favor of certification.

5.    *Predominance*

The predominance inquiry is "far more demanding" than the commonality

requirement. In re Hydrogen Peroxide, 552 F.3d at 310-11 (quoting Amchem Prods.,

Inc. v. Windsor, 521 U.S. 591, 623 (1997)). To satisfy this element, common issues

must constitute a "significant part" of the individual cases. See In re Chiang, 385

F.3d 256, 273 (3d Cir. 2004) (citations omitted), abrogated on other grounds by In re

Hydrogen Peroxide, 552 F.3d at 318-19 & n.18. Nonetheless, the presence of some

individualized issues and inquiries will not defeat a predominance finding.  See id.

Plaintiffs contend that a trio of common issues—whether the coils are defective,

whether JCI knew they were defective, and whether JCI failed to disclose the

defect—is the fulcrum of each class member's claim.  (See Doc. 95 at 21).  We agree

and conclude that this case readily surmounts the predominance hurdle.

### 6.    *Superiority*

Rule 23(b)(3) outlines several factors pertinent to the superiority inquiry, to

wit: (a) the class members' interest in individually controlling the action; (b) the

nature and extent of litigation already commenced by or against individual class

members; (c) the desirability *vel non* of concentrating the litigation in the chosen

forum; and (d) whether the case, if tried, will present intractable case management

problems.  FED. R. CIV. P. 23(b)(3).  The factors balance, "in terms of fairness and

efficiency, the merits of the class action against those alternative available methods

of adjudication."  In re Chocolate, 289 F.R.D. at 225 (quoting In re Warfarin Sodium

Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004)).

As a threshold matter, plaintiffs assert (correctly) that considerations

regarding the difficulties of managing a class action through trial do not arise for

settlement-only classes because, if a settlement is approved, there will be no trial.

Amchem Prods., 521 U.S. at 620.  The remaining factors support certification.  The

individual class members would have little interest in pursuing individual actions

when the cost of litigating would quickly outpace the value of their claim.  And

concentrated class settlement procedures avoid a potentially significant strain

on judicial resources.  As this court has previously observed, certification is the

superior method of adjudication in terms of both economic and judicial efficiency when a case involves thousands of class members disbursed throughout the United States who otherwise likely could not afford to pursue claims individually.  See *In re Chocolate*, 289 F.R.D. at 225-26.  We have little difficulty concluding that class certification is the fairest and most efficient means of adjudicating this case.

Plaintiffs have established that the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—are readily satisfied in this case.  See FED. R. CIV. P. 23(a).  The court further finds that a settlement class may be maintained under Rule 23(b)(3) because plaintiffs have established both predominance and superiority.  See FED. R. CIV. P. 23(b)(3).  Accordingly, we will grant plaintiffs' request for certification of a settlement class.

**B.     Approval of Class Settlement**

A class action cannot be settled absent court approval upon a finding that the settlement is "fair, reasonable and adequate."  FED. R. CIV. P. 23(e)(2).  Within the Third Circuit, it is well-established that the "law favors settlement," especially in class actions, when considerable resources might be saved by early and amicable resolution of a case.  *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig. ("*In re* GMC Trucks"), 55 F.3d 768, 784 (3d Cir. 1995) (citations omitted).

We consider nine factors (the "Girsh factors") in measuring the fairness of a proposed settlement, to wit:

> (1) the complexity, expense[,] and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the

> class action through the trial; (7) the ability of the
> defendants to withstand a greater judgment; (8) the range
> of reasonableness of the settlement fund in light of the best
> possible recovery; [and] (9) the range of reasonableness of
> the settlement fund to a possible recovery in light of all the
> attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal alterations and citations

omitted).  After Girsh, the circuit suggested that, in appropriate circumstances,

courts may also wish to consider additional factors (the "Prudential factors"):

> (1) the maturity of the underlying substantive issues,
> as measured by experience in adjudicating individual
> actions, the development of scientific knowledge, the
> extent of discovery on the merits, and other factors that
> bear on the ability to assess the probable outcome of a
> trial on the merits of liability and individual damages; (2)
> the existence and probable outcome of claims by other
> classes and subclasses; (3) the comparison between the
> results achieved by the settlement for individual class or
> subclass members and the results achieved—or likely to
> be achieved—for other claimants; (4) whether class or
> subclass members are accorded the right to opt out of
> the settlement; (5) whether any provisions for attorneys'
> fees are reasonable; and (6) whether the procedure for
> processing individual claims under the settlement is fair
> and reasonable.

In re NFL Players Concussion Litig., 821 F.3d at 436 (citing In re Prudential Ins.

Co. America Sales Practice Litig. Agent Actions, 148 F.3d 283, 323 (3d Cir. 1998)).

### 1.   *Presumption of Fairness*

Plaintiffs maintain, as a threshold issue, that a presumption of fairness

applies to their proposed settlement.  (Doc. 95 at 24-25); see also In re NFL Players

Concussion Litig., 821 F.3d at 436 (quoting In re Cendant Corp. Litig., 264 F.3d 201,

232 n.18 (3d Cir. 2001)).  The presumption applies when (1) negotiations occurred at

arm's length; (2) the parties exchanged sufficient discovery; (3) class counsel are

experienced in similar litigation; and (4) any objectors represent "a small fraction" of the class. *In re* NFL Players Concussion Litig., 821 F.3d at 436 (quoting *In re* Cendant , 264 F.3d at 232 n.18).

The presumption of fairness applies here. The parties exchanged thousands of pages of documents and reached their settlement under the auspices of a retired federal magistrate judge during multiple mediation sessions. (See Doc. 95 at 24-25). It is beyond peradventure that counsel are well-qualified in class action litigation and have vigorously pursued the interests of the plaintiff class. The objectors—12 total—represent a miniscule fraction of the class, which currently comprises more than 10,000 members. This settlement warrants the presumption of fairness.

The fairness presumption is rebuttable, however, and the court must fastidiously examine a settlement's terms and ensure that class counsel has advocated for and protected the interests of all class members. See First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 516 (E.D. Pa. 2007) (quoting *In re* Warfarin, 391 F.3d at 534-35). Hence, courts must still explore the Girsh and Prudential factors even after finding that the presumption applies. See, e.g., *In re* NFL Players Concussion Litig., 821 F.3d at 436-37 (finding presumption applies but nonetheless proceeding to extensive analysis of the Girsh and Prudential factors).

## 2. *Complexity, Expense, and Likely Duration of Litigation*

The first Girsh factor considers "probable costs, in both time and money, of continued litigation." Id. at 437-38 (quoting *In re* Warfarin, 391 F.3d at 535-36). We agree with counsel that, had this case proceeded to trial, extensive and expensive litigation would have ensued. Defendants' pending motion to dismiss fully tests the

timeliness, justiciability, and merits of plaintiffs' claims. Had any aspect of that motion failed, the parties would have proceeded to full merits and class discovery, dispositive motion practice, and eventually trial. The parties also highlight the possibility of a Rule 23(f) interlocutory appeal if the court did certify a litigation class. (See Doc. 95 at 26-27). The expense and likely duration of this litigation favors settlement.

### 3. *Reaction of the Class to the Settlement*

The second <u>Girsh</u> factor gauges whether class members generally support the settlement. *In re* NFL Players Concussion Litig., 821 F.3d at 438 (quoting *In re* Warfarin, 391 F.3d at 536). Notice in this matter was disseminated to more than 893,000 class members. (Doc. 97 ¶ 7). Of more than 10,000 responses, only 12 class members objected to the settlement. (<u>Id.</u> ¶ 20). There can be little doubt that the settlement has been well-received.

### 4. *The Stage of the Proceedings and the Amount of Discovery Completed*

The third factor examines the degree to which the case developed before counsel elected to settle—that is we ask whether counsel had a true appreciation of the merits before negotiating. *In re* NFL Players Concussion Litig., 821 F.3d at 438-39 (quoting *In re* Warfarin, 391 F.3d at 537). Here, the parties assert that counsel conducted extensive review of the facts underlying the class claims and considered the ramifications of settlement. (See Doc. 95 at 29). Class counsel have participated in three other cases concerning formicary corrosion of copper coils and began this litigation with a firm understanding of the legal and factual foundation, including all

attendant risks.  (See id.)  Defendants' motion to dismiss, which the parties fully briefed, allowed each side to consider the strengths and weaknesses of their respective claims and defenses.  This factor too favors settlement.

### 5.     *Risks of Establishing Liability and Damages*

The fourth and fifth factors examine the dual risks of litigation—establishing liability and damages—and balances the likelihood of success on both components with the benefits of the negotiated settlement.  *In re* NFL Players Concussion Litig., 821 F.3d at 439 (quoting Prudential, 148 F.3d at 319).  In other words, we measure the potential but uncertain value of litigating with the immediate and determinable value of settlement.  See id.; see also *In re* GMC Trucks, 55 F.3d at 814.

If JCI were to prevail on any aspect of its motion to dismiss, plaintiffs' claims would be substantially weakened—if not entirely defeated right out of the gate.  JCI has identified several decisions dismissing virtually identical claims on grounds similar to those raised in JCI's Rule 12 motion.  (Doc. 39 at 1 n.2 (collecting cases)).  Plaintiffs face a not-insignificant hurdle in establishing at trial not only that JCI's product was defective, but also that JCI knew and failed to disclose that its product was defective.  And plaintiffs would additionally need to establish causation—that defective coils, rather than environmental factors, caused the corrosion.  These uncertainties militate in favor of settlement.

### 6.     *Risks of Maintaining the Class Through Trial*

The Third Circuit recently held that the sixth Girsh factor receives only "minimal consideration" in the settlement class context.  *In re* NFL Players Concussion Litig., 821 F.3d at 440 (citation omitted).  Plaintiffs correctly aver that

this factor still requires some consideration because the strength of the class bears directly on the range of recovery components of the <u>Girsh</u> analysis. (<u>See</u> Doc. 95 at 33-35 (citing *In re* <u>GMC Trucks</u>, 55 F.3d at 817)). The risk that the class may be decertified by the district court at any time were this matter to proceed to trial weighs in favor of settlement. <u>See</u> *In re* <u>Warfarin</u>, 391 F.3d at 537.

**7.    *Ability of Defendants to Withstand Greater Judgment***

The seventh factor is "most relevant" when the settlement is justified, at least in part, by a defendant's professed inability to pay. *In re* <u>NFL Players Concussion Litig.</u>, 821 F.3d at 440. The mere fact that a defendant *could* withstand a greater judgment, however, does not mean that the settlement is unreasonable. <u>See</u>, <u>e.g.</u>, <u>id.</u> (quoting <u>Sullivan</u>, 667 F.3d at 323); *In re* <u>Warfarin</u>, 391 F.3d at 538; <u>see also</u> *In re* <u>GMC Trucks</u>, 55 F.3d at 818. This factor is a wash.

**8.    *Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All Attendant Risks of Litigation***

The final two factors together form a capstone which tests the settlement's overall reasonableness: they task the court to determine whether a settlement represents "a good value for a weak case or a poor value for a strong case." *In re* <u>NFL Players Concussion Litig.</u>, 821 F.3d at 440 (quoting *In re* <u>Warfarin</u>, 391 F.3d at 538). There is no mathematical formula for measuring reasonableness. The Third Circuit describes the test as follows: "[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." <u>Prudential</u>, 148 F.3d at 322 (quoting *In re* <u>GMC Trucks</u>, 55 F.3d at 806).

Even if plaintiffs were ultimately successful in their claims at trial, there is no guarantee that any plaintiff would recover substantial damages. Plaintiffs request punitive damages in their amended complaint, but the standard for recovery of punitive damages is a stringent one. Moreover, the parties have identified several legal and factual hurdles that stand between plaintiffs and proven liability. The proposed settlement is reasonable in view of the risk-reduced value of plaintiffs' claims.[2]

### 9. *Objections*

Only 12 class members object to the settlement. (See Docs. 95-1 to -12). The objections can be catalogued into five groups: those requesting reimbursement of 100 percent of out-of-pocket costs; those requesting reimbursement for incidental damages; those seeking to expand the dealers with whom rebates can be redeemed beyond JCI authorized dealers; those who believe the claims process requires too much documentation; and those who contend that the warranty period should be extended for uncoated copper coils which have not yet experienced a failure. (See id.) Plaintiffs respond to each of these objections at length in their memorandum supporting final approval. (Doc. 95 at 38-51). We address the objections in turn.

All 12 objectors first take issue with the amount of reimbursement provided by the settlement. They contend that the settlement is unreasonable for failure to

---

[2] The parties do not address the <u>Prudential</u> factors in their motion. The court finds that only two are relevant *sub judice*. The procedure for processing individual claims is the subject of an objection and is addressed in the next section. The provision for and reasonableness of attorneys' fees is also discussed *infra* in Section C examining class counsel's motion for attorneys' fees and expenses.

reimburse homeowners 100 percent of their out-of-pocket costs. This argument fundamentally misapprehends the bargained-for nature of the benefit provided: a settlement necessarily requires all parties to make calculated concessions. Here, JCI compromises by waiving the protective shield of its parts-only warranty; the class compromises by accepting a guaranteed but risk-reduced benefit previously unavailable to them. The $75 rebate certificate for one-time failures reflects the reality that a single failure is not necessarily indicative of a defective product; the $550 cash reimbursement for two or more failures, capped at $1,100 for all failures, reflects that a second failure within the warranty period is suggestive (but not *ipso facto* proof) of a defect. (See Doc. 95 at 40-44). These amounts were the result of intense and informed negotiations with the assistance of the mediator. In view of the risks of proving liability and causation, these awards are quite reasonable.[3]

The objections seeking incidental damages are related to the above request for full reimbursement of service costs. These objectors request reimbursement for all conceivable costs associated with an alleged defect, ranging from damage caused to air duct systems, lost wages for taking time off work for service visits, and the potential health and safety effects caused by leaking refrigerant or a temporary lack of proper air conditioning. Plaintiffs observe that each of these enumerated items

---

[3] This same rationale answers the objection which asks why all failures are not reimbursed equally. (See Doc. 95-1 at 3). Specifically, the objector queries: "Shouldn't each failure of the Copper Coil be treated equally and the compensation for each failure be equitable, regardless of the date when and/or number of failures that occurred?" (Id.) As detailed above, the parties deliberately chose to treat single failure claims differently than multiple failure claims given the liability inferences to be drawn from a second failure during the warranty period.

presents manifold and individualized issues of causation and valuation that cannot be addressed in a class settlement context. (Doc. 95 at 46). Plaintiffs also note that this litigation never sought to recover costs for damaged air ducts, and there is no allegation in the pleadings that such damage results from defective coils. (See id.) Settlements necessarily require "yielding of the highest hopes in exchange for certainty and resolution." <u>In re</u> GMC Trucks, 55 F.3d at 806. If any class member felt they had a stronger damages claim than the rest of the class, they were free to opt out of the settlement class. The court will overrule the objections to the rebate and reimbursement remedies provided by

the settlement agreement.

One objector is dissatisfied that the $75 service rebate is redeemable only with authorized JCI dealers. The objector suggests that this arrangement is self-dealing which "increases costs" for the class. (Doc. 95-7 at 1). Plaintiffs respond with ample and adequate justification for limiting redemption to JCI dealers: the limitation increases the likelihood that service will be performed correctly and will allow accurate monitoring of the rebate system. (See Doc. 95 at 46-47). Because JCI authorized dealers are independent, JCI receives no revenue from redemption of the rebates. (<u>Id.</u>) This objection is without merit.

The same objector contends that the documentation required to submit a claim is "too extensive" given that the claim period dates to 2008. (Doc. 95-7 at 1). This objection is belied by the claim form itself, which permits claimants to prove purchase by "[a]ny competent evidence," including but not limited to "an invoice, receipt, photograph, owners' manual, or registration card." (Doc. 90-1 at 62). To

receive a $75 rebate certificate, claimants must submit "evidence of the copper coil failure," including "invoice(s), receipt(s), photograph(s), correspondence to or from JCI or an HVAC dealer or contractor, warranty claim(s), or *any other competent evidence* of the failure." (Id. (emphasis added)).  Similarly, to submit a claim for a reimbursement check, a class member need only provide proof that the coil was in fact replaced and evidence of the amounts paid, in the form of, *inter alia*, invoices, receipts, checks, credit card statements, or "*any other competent evidence*." (Id. (emphasis added)).  The documentation requirement reflects the bare minimum proof necessary to protect the settlement from abuse.  The court overrules this objection.

Finally, one objector contends that the settlement should extend the warranty on all copper coils which have not yet failed for either the lifetime of the product or fifteen years, the average lifetime of a unit.  (Doc. 95-1 at 4).  Plaintiffs' response is twofold: first, by virtue of the settlement, JCI has already extended its limited manufacturer's warranty to cover labor and refrigerant costs not previously available to homeowners; and second, extending the warranty to cover the lifetime of the product would "illogically extend[] the benefit conferred . . . to the point that the systems would be expected to need replacement" due to normal wear-and-tear. (Doc. 95 at 49-50).  The parties further allege that formicary corrosion typically presents within 5 to 10 years of installation; thus, the current warranty period offers an appropriate limitation for capturing claims likely related to a defective coil.  (Id.) We agree that to extend the manufacturer's warranty as requested would result in a windfall to class members whose systems fail for reasons other than alleged defects.

### 10. *Conclusion*

The court has rigorously reviewed the amended settlement agreement for fairness, adequacy, and reasonableness. We have carefully considered each of the twelve objections and have weighed the points raised therein against the terms of the settlement. The court concludes that none of the objections upset the presumption of fairness or the weighted balance of the <u>Girsh</u> factors. The settlement provides immediate and certain relief to class members who, given the likely value of the average claim, otherwise would lack the means or motivation to pursue appropriate relief. The court concludes that the proposed settlement is fair, adequate, and reasonable under Federal Rule of Civil Procedure 23. We will grant plaintiffs' motion for final approval of the amended settlement agreement.

### C.   Class Notice

Rule 23(e) mandates that all members of a class be notified of the terms of any proposed settlement. FED. R. CIV. P. 23(e)(1). Such notice is "designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." <u>Prudential</u>, 148 F.3d at 327 (internal quotation marks omitted). District courts must closely monitor notice provided at all phases of a class action "to safeguard class members from unauthorized and misleading communications from the parties or their counsel." <u>*In re* Cmty. Bank</u>, 418 F.3d at 310 (internal quotation marks omitted).

We approved the parties' notice plan in the course of provisionally certifying the class and preliminarily approving the settlement agreement. (<u>See</u> Doc. 91). The

settlement administrator submitted a declaration detailing its compliance with and implementation of the court-approved notice plan.  (See Doc. 97).  The rate at which claims have been received confirms that notice has been effective.  The court finds that the notice provision of Rule 23(e) is satisfied.

### D.   Attorneys' Fees and Expenses

An award of attorneys' fees is within the sound discretion of this court.  FED. R. CIV. P. 23(h).  Courts generally apply one of two methods to calculate attorneys' fees: the percentage of recovery method, or the lodestar method.  Prudential, 148 F.3d at 333.  The lodestar method is traditionally applied in matters (like this one) in which "the nature of the recovery" precludes estimation of the settlement's total value.  Id. (citing In re GMC Trucks, 55 F.3d at 820).  The lodestar method employs a simple formula: multiply the number of hours reasonably attributable to the case by a reasonable hourly billing rate.  Id.  Courts determine a reasonable hourly rate in view of geographical area, the nature of the services provided, and the attorneys' experience and qualifications.  See In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305 (3d Cir. 2005).  The court has discretion to adjust the lodestar after it is calculated based on the results obtained, the litigation's complexity and scope, the quality of counsel's representation, and any public policy considerations.  See Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990).

We then measure the requested fee against the lodestar to determine the lodestar multiplier.  Multipliers between one and four are routinely approved in the Third Circuit.  See In re Cendant, 243 F.3d at 742 (citing Prudential, 148 F.3d at 341).  A negative multiplier reflects that counsel is requesting only a fraction of the

billed fee; negative multipliers thus "favor[] approval." Altnor v. Preferred Freezer Servs., 197 F. Supp. 3d 746, 767 (E.D. Pa. 2016) (citation omitted). Although the percentage-of-recovery approach is inapplicable here given that the settlement value *in toto* is incalculable, the Gunter/Prudential factors that typically govern percentage-of-recovery analyses are nonetheless informative in measuring the reasonableness of the lodestar award. Those factors are:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re* Diet Drugs, 582 F.3d 524, 541 (3d Cir. 2009) (citing Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000); Prudential, 148 F.3d 283).

Class counsel seeks attorneys' fees in the amount of $1,000,000 and reimbursement of out-of-pocket expenses in the amount of $22,176.81. (See Docs. 92-93, 99). They calculate a current lodestar fee of $1,156,601.75 (exclusive of costs associated with the final approval motion and hearing), resulting in a multiplier of 0.865. Counsel suggests that the negative multiplier, combined with an examination of the Gunter/Prudential factors, favors approving the requested fee.

The court agrees. The settlement benefits a class of substantial size; the attorneys are well-qualified; the case involved substantial time and resources and could be fairly characterized as complex; and class counsel proceeded despite the risk that JCI could prevail (and in fact had prevailed in other, similar cases). In an analogous case involving Lennox, the court approved a fee award at a lodestar multiplier of .88. See Thomas v. Lennox Indus. Inc., No. 1:13-CV-7747 (N.D. Ill.). Moreover, despite the additional efforts by class counsel necessary to resolve coil incompatibility issues after the first settlement agreement had been preliminarily approved, class counsel did not increase its initial fee request. Only one objection speaks to attorneys' fees; that objection is without merit—it does not genuinely dispute counsel's calculation or performance, but instead suggests that the fee award should be distributed amongst the class.

Class counsel also request reimbursement in the amount of $22,176.81 for out-of-pocket expenses such as copying fees, expert fees, computerized research, travel, and costs of mediation. (Doc. 99). The settlement agreement contemplates reimbursement for costs and expenses up to a maximum of $25,000. (See Doc. 90-1 ¶ 59). Given the relative complexity of this matter, the court concludes that reimbursement of costs and expenses of $22,176.81 is reasonable.

### E.  Service Awards

Plaintiffs lastly ask the court to approve service awards in the amount of $2,500 each for named plaintiffs Steven Dickerson, Robert Hester, Nancy Roberts, Katie Evans Moss, and Richard Sanchez. (See Doc. 96; see also Doc. 90-1 ¶ 64). A service award compensates class representatives for services provided and risks

incurred during the course of litigation and settlement proceedings and rewards their public service in contributing to enforcement of the laws.  See <u>Sullivan</u>, 667 F.3d at 333 n.65.  The court finds that the named plaintiffs' assistance to this case was valuable and substantial.  The service awards of $2,500 to each named plaintiff are entirely reasonable.

**III.**    <u>**Conclusion**</u>

For all of the reasons stated herein, the court will grant in full the pending motion (Doc. 94) for final approval of class action settlement and motion (Doc. 92) for approval of attorneys' fees and expenses.  An appropriate order shall issue.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        August 22, 2017